**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ESTATE OF EITAM HENKIN**, by its legal representatives, Yoav Armoni and David Jackson, | ) ) ) ) | |
| **ESTATE OF NAAMA HENKIN**, by its legal representatives, Yoav Armoni and David Jackson, | ) ) ) ) ) | |
| **I.Z.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, | ) ) ) | |
| **M.H.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, | ) ) ) | |
| **N.E.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, | ) ) ) | |
| **N.Y.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, | ) ) ) | |
| *Plaintiffs*, | ) ) | **COMPLAINT** |
| v. | ) ) | Civil Action No.  1:19-cv-1184 |
| **THE ISLAMIC REPUBLIC OF IRAN** The Ministry of Foreign Affairs Imam Khomeini Ave., United Nations St. Tehran, Iran, | ) ) ) ) ) | |
| **ISLAMIC REVOLUTIONARY GUARD CORPS** Armed Forces Headquarters Zone 7 – Shariati Ghoddoosi Square (Ghaar) Tehran, Iran, | ) ) ) ) ) ) ) | |
| **IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY** (a/k/a Vezarat-e Ettela'at Va Amniat-e Keshvar a/k/a VEKAK a/k/a VAJA) Second Negarestan St., Pasdaran Ave. Tehran, Iran, | ) ) ) ) ) ) ) | |

**BANK MARKAZI JOMHOURI ISLAMIC**　)
**IRAN**　)
a/k/a Central Bank of the Islamic Republic of　)
Iran　)
No 198, Mirdamad Boulevard　)
Tehran, Iran,　)
　)
**BANK MELLI IRAN**　)
Ferdowsi Avenue　)
10 Building　)
P.O. Box 11365-144　)
Tehran, Iran,　)
　)
**BANK SADERAT IRAN**　)
43 Somayeh Ave.,　)
P.O. Box 15745-631　)
Tehran, Iran,　)
　)
and　)
　)
**THE SYRIAN ARAB REPUBLIC**　)
Ministry of Foreign Affairs　)
Damascus, Syria,　)
　)
　　　　　　　　　　*Defendants*.　)
　)

## COMPLAINT

Plaintiffs the Estate of Eitam Henkin, the Estate of Naama Henkin, and their four minor

children I.Z.H., M.H.H., N.E.H., N.Y.H. (collectively, "Plaintiffs") bring this Complaint under the

terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, against the

Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC") including its

Quds Force, the Iranian Ministry of Intelligence and Security ("MOIS"), Bank Merkazi Jomhouri

Islamic Iran a/k/a Central Bank of the Islamic Republic of Iran ("Bank Merkazi"), Bank Melli Iran

("Bank Melli"), Bank Saderat Iran ("Bank Saderat"), and the Syrian Arab Republic ("Syria"),

jointly and severally, and allege as follows:

## INTRODUCTION

1.     On the evening of October 1, 2015, Eitam Simon Henkin (a U.S. national) was driving his wife, Naama Henkin, and their four minor children, I.Z.H., M.H.H., N.E.H., in the West Bank when their car was overtaken by another vehicle containing three Palestinian men.

2.     The three men were part of a terrorist group that had committed terrorist acts before, and this time, they decided to kidnap a Jewish resident in the West Bank—a tactic used by terrorists to barter the hostage in exchange for prisoners and gain leverage in negotiations with the Israeli government.

3.     As they overtook the Henkins' car, one of the terrorists leaned out of the window and sprayed automatic gunfire at the Henkin Family.  Wounded and bleeding, Eitam Henkin was forced to stop the car.

4.     Two of the three terrorists exited their car and approached on either side of the Henkins' car.  One opened the driver's side door and attempted to kidnap Eitam.

5.     Eitam fought back.  Although he was wounded by gunfire, Eitam bravely attempted to defend his family and began disarming one of the terrorists while yelling for his family to run. He succeeded—but only for a short time.  The terrorist on the opposite side of the Henkins' car saw that Eitam was fighting back and shot Eitam with an automatic weapon, killing him.

6.     Even though her husband had just been brutally murdered right in front of her, Naama courageously fought to defend her young family.  She too was killed.  Shot dead at point blank range.

7.     The four Henkin children, then ages nine, seven, four, and ten months, endured and bore witness to this horrific attack (the "Attack")—the hail of automatic gunfire and the shocking murder of their parents—all from the backseat of the Henkins' car.

8.     After murdering Eitam and Naama, the terrorists abandoned their kidnapping plot. They fled the scene, and with the help of a co-conspirator, they hid.  The Israeli Army apprehended the attackers several days later, together with other individuals who helped them plan and execute the Attack.  The three attackers, and another terrorist who recruited the squad's members and furnished them with weapons, admitted their roles in the Attack and in one other attack.  They also admitted their membership in an illegal, terrorist organization—Harakat al-Muqawamah al-Islamiyyah, also known as "Hamas."  An Israeli military court sentenced them to two life sentences plus thirty (30) years.

9.     The terrorists also admitted that the Attack was authorized, directed, and supported by Hamas, which praised the brutal Attack as "heroic" and called for more "high-quality attacks."[1]

10.     Hamas is a radical terrorist organization dedicated to the destruction of Israel and the creation of an Islamic state in the territory of Israel, Gaza, and the West Bank.  Hamas openly and publicly embraces violence, and has committed numerous terrorist attacks in Israel, the Gaza Strip, and the West Bank, killing many civilians, including U.S. nationals, and injuring many more. Hamas's terror campaign continues to this day.

11.     Iran and Syria share with Hamas one animating principle:  the violent destruction of Israel.  Hamas relies on Iran and Syria for material support, including but not limited to, training, weapons, and financing.   Iran provides logistical and military support to Hamas through Defendants IRGC (including its Quds Force), and MOIS, and Iran funnels much of its financial sponsorship of Hamas through Defendants Bank Markazi, Bank Melli, and Bank Saderat.  Indeed, "but for the support provided by Iran and Syria, Hamas would not have been able to develop into

---

[1] The Times of Israel, *Israeli mother and father shot dead in West Bank terror attack* (Oct. 1, 2015), http://www.timesofisrael.com/two-seriously-wounded-in-west-bank-terror-attack/.

the cohesive, organized, and deadly organization that it is today."[2] Defendant Iran was designated a State Sponsor of Terrorism in 1984, and Defendant Syria was designated a State Sponsor of Terrorism in 1979. Both Iran and Syria remain designated to this day.

12. Plaintiffs are the estate of the murdered U.S. national Eitam Henkin, the estate of his spouse Naama Henkin, and their four minor children, who are trying to cope with experiencing the brutal Attack. They bring this action under the Foreign Sovereign Immunities Act ("FSIA") against Defendants Iran, together with various agencies or instrumentalities of Iran, and Syria for the wrongful death and related serious injuries arising from the attempted hostage taking and the extrajudicial killing of Eitam Henkin, including economic damages, solatium, pain and suffering, and punitive damages.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over this matter and over the Defendant pursuant to 28 U.S.C. §§ 1330(a), 1331, and 1605A(a).

14. The Court has subject matter jurisdiction over claims for wrongful death, personal injury, and related torts against a foreign state that is a State Sponsor of Terrorism and also against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, where the victim was a national of the United States. 28 U.S.C. § 1605A(a).

15. Defendants Iran and Syria were designated State Sponsors of Terrorism at all relevant times and are therefore subject to the Court's jurisdiction. 28 U.S.C. § 1605A(a).

---

[2] *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 40 (D.D.C. 2017) (subsequent history omitted).

16.     As pleaded below, the IRGC and MOIS are political subdivisions of Iran, and Banks Melli, Merkazi, and Saderat are agencies and instrumentalities of Iran. Accordingly, these Defendants are considered a foreign state. 28 U.S.C. § 1603.

17.     Plaintiff Eitam Henkin was a national of the United States, and accordingly, the Court has subject matter jurisdiction over his estate's claims. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). Those claims are governed by federal law. 28 U.S.C. § 1605A(c).

18.     The Court also has subject matter jurisdiction over the claims of the immediate family member Plaintiffs, who are not U.S. nationals (or the legal representative of U.S. nationals), the Estate of Naama Henkin (Eitam's spouse) and the minor children of Eitam Henkin (I.Z.H., M.H.H., N.E.H., and N.Y.H.), because one of the Attack's victims, Eitam Henkin, was a national of the United States. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). Their claims are governed by the common and statutory laws of the District of Columbia or the State of Israel.

19.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state, its political subdivisions, and/or any agency or instrumentality of a foreign state may be brought in the United States District Court for the District of Columbia.

## PARTIES

### A.     Plaintiffs

20.     ***Estate of Eitam Henkin***.  Eitam Henkin, a national of the United States, was killed in the Attack. The Estate of Eitam Henkin brings its claims through its court-appointed "estates managers"—*i.e.*, personal representatives—Yoav Armoni and David Jackson.

21.     ***Estate of Naama Henkin***.  Naama Henkin was the spouse of Eitam Henkin and was also killed in the Attack. The Estate of Naama Henkin brings its claims through its court-appointed "estates managers"—*i.e.*, personal representatives—Yoav Armoni and David Jackson.

22.     *I.Z.H.,* a minor, is the son of Eitam and Naama Henkin.  I.Z.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

23.     *M.H.H.,* a minor, is the son of Eitam and Naama Henkin.  M.H.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

24.     *N.E.H.,* a minor, is the son of Eitam and Naama Henkin.  N.E.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

25.     *N.Y.H.,* a minor, is the son of Eitam and Naama Henkin.  N.Y.H.'s claims are brought by his guardians *ad litem*, Yoav Armoni and David Jackson.

### B.     Defendants

26.     *Iran*.  Iran is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603.  Since 1984, Iran has been designated the by United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j), Section 620A of the Foreign Assistance Act, 22 U.S.C. § 2371, and Section 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d).  At all relevant times, Iran provided Hamas with material support, training, weapons, money, and resources for acts of extrajudicial killings and hostage taking, as those terms are used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled Hamas to be a terrorist organization capable of recruiting terrorists and carrying out terrorist acts, like the Attack.

27.     *IRGC (and the Quds Force)*.  The IRGC and the Quds Force, which is a branch of the IRGC, are subdivisions of the state of Iran and are therefore treated as Iran itself.[3]  The IRGC was founded after Iran's 1979 Islamic revolution.  It functions as an intelligence organization

---

[3] *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77, 85 (D.D.C. 2018); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 33 (D.D.C. 2018).

whose role is to defend the Islamic fundamentalist revolution within Iran and to export the revolution's principles throughout the world, including through acts of terrorism.  As this Court has held, the IRGC "is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran.  It is similar to the Nazi party's SA organization prior to World War II."[4]

28.     The IRGC also holds a controlling number of positions in the Iranian government and its economy.  IRGC veterans have served as governors of many of Iran's thirty-one provinces.  The IRGC also controls many companies spanning a wide range of industries, including petroleum production, construction, nuclear power, banking, and others—some of the proceeds from which the IRGC uses for illicit purposes, including funding terrorism.  Although some public sector companies were or are being "privatized," most public sector companies marked for "privatization" have ended up, or are expected to end up, in the hands of the IRGC and its individual commanders.  The IRGC has played a central role in Iran's becoming the world's foremost state sponsor of terror and has recently been designated a Foreign Terrorist Organization under section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

29.     The Quds Force is a branch of the IRGC and is Iran's primary tool for exporting the Iranian Islamic revolution beyond Iran's borders.  The Quds force does so by setting up and operating armed terrorist cells, establishing educational systems for indoctrination, and otherwise acting to subvert secular, pro-Western Arab-Muslim regimes.  It also provides material support to terrorist organizations, including Hamas.  In 2007, the Quds Force was designated a terrorist entity pursuant to Executive Order 13224—which authorizes the U.S. government to designate and block

---

[4] *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006).

the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism—and remains designated to this day.

30.     **MOIS**.  MOIS is the Iranian intelligence service.  It supports Iran's international terrorist activities by providing material support, including resources and intelligence, for the commission of acts of extrajudicial killing and hostage taking.  This Court has consistently found MOIS to be a political subdivision of Iran for purposes of liability and damages under the FSIA.[5] Further, in 2012, the United States designated MOIS as a terrorist organization under E.O. 13224 (and two other executive orders specific to human rights abuses in Iran and Syria, E.O. 13553 and E.O. 13572, respectively), stating, "we are designating the MOIS for its support to terrorist groups, including al Qa'ida, al Qa'ida in Iraq, Hizballah and HAMAS, again exposing the extent of Iran's sponsorship of terrorism as a matter of Iranian state policy."[6]

31.     **Bank Markazi**.  Bank Markazi is Iran's central bank and is wholly owned by the Iranian government.  According to Bank Markazi itself, it is "responsible for the design and implementation of the monetary and credit policies with due regard to the general economic policy of the country."[7]  Accordingly, Bank Markazi is an agency or instrumentality of Iran.[8]

---

[5] *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 721-722 (D.D.C. 2010); *Bennett v. Islamic Republic of Iran*, 507 F. Supp.2d 117, 125 (D.D.C. 2007) ("Defendant MOIS is considered to be a division of state of Iran, and is treated as a member of the state of Iran itself."); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105, 116 (D.D.C. 2005).

[6] U.S. Treasury Department, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

[7] Central Bank of the Islamic Republic of Iran, *General Information*, http://www.cbi.ir/Page/GeneralInformation.aspx (last visited Apr. 18, 2019).

[8] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011) ("[T]he Central Bank of the Islamic Republic of Iran [is an] agenc[y] and instrumentalit[y] of the state of Iran. [It] has a legal corporate existence outside the government and core functions which are commercial, not governmental, in nature.  [It] is, however, tightly connected to the government of Iran, and [it] is an organ of the government and/or has been owned, directed, and controlled by the Iranian state.").

32.    ***Bank Melli***.  Bank Melli is Iran's largest commercial bank.  It was established in 1927 by order of the Iranian Parliament and has remained a state-owned bank thereafter.  Bank Melli describes itself as "a powerful arm of the government."[9]  Bank Melli most notably provides banking services to entities involved in Iran's nuclear and ballistic missile programs, but relevant here, Bank Melli also provides banking and financial services to the IRGC and the Quds Force and is one of Iran's main conduits for funding Hamas.  Accordingly, Bank Melli is an agency or instrumentality of Iran.[10]

33.    ***Bank Saderat***.  Bank Saderat was established in 1952 and became a commercial state-owned bank of Iran in 1979 after the revolutionary government nationalized the bank.  It has approximately 3,200 branch offices, and has been used by the Government of Iran to channel funds to terrorist organizations, including Hamas.  From 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.  Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas.  Further, as of early 2005, Hamas had substantial assets deposited in Bank Saderat.  On October 25, 2007, the Treasury Department designated Bank Saderat under E.O. 13224 as a terrorist financier, specifically noting that the reason for the designation was Bank Saderat's provision of financial services to designated terrorist groups,

---

[9] Bank Melli Iran, *History of Bank Melli Iran*, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011 (last visited Apr. 17, 2019).

[10] *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954-957 (9th Cir. 2016); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 418-19 (S.D.N.Y. 2013).

Hizballah and Hamas.  Although Bank Saderat claims to have been "privatized" in 2009, this Court has since held that Bank Saderat is still an agency or instrumentality of Iran.[11]

34.     ***The Syrian Arab Republic***.  Syria is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603.  Since 1979, Syria has been designated by the United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j).  Syria has long provided Hamas with material support, training, weapons, money, safe-haven, and other resources for acts of extrajudicial killings and hostage taking as those terms are defined in the FSIA, 28 U.S.C. § 1605A(a)(1).  During the Syrian civil war, Syria's support for Hamas declined, but Syria's deep and long-standing support enabled Hamas to be the cohesive, organized, and deadly organization that it is today, capable of conducting terror campaigns, including the Attack.

## FACTS

### A.     Hamas

35.     Hamas is a violent terrorist organization.  Because of its history of conducting terror attacks, the United States Government designated Hamas as a Specially Designated Terrorist (1995), under E.O. 12947, a Foreign Terrorist Organization (1997), under 8 U.S.C. § 1189, and a Specially Designated Global Terrorist (2001), under E.O. 13224.  Hamas has remined designated to this day.  These designations of Hamas were public events, well known to the entire international community, including Defendants.  In addition, numerous Hamas leaders and fundraisers are designated by the United States Government as Specially Designated Nationals whose assets have been frozen as a result of their activities for Hamas.

---

[11] *Shoham v. Islamic Republic of Iran,* 2017 WL 2399454, at *8 (D.D.C. June 1, 2017) (holding that Bank Saderat is an instrumentality of Iran), *appeal dismissed*, 2019 WL 1270405 (D.C. Cir. Feb. 25, 2019).

36.     Hamas was formed in December 1987 as an outgrowth of the Muslim Brotherhood. Hamas has the declared goal of eliminating Israel and establishing an Islamist state that covers present-day Israel, the Gaza Strip, and the West Bank.

37.     For example, Hamas's original 1988 charter states that "[t]here is no solution to the Palestinian problem except by Jihad"; is replete with xenophobic, anti-Semitic references; and openly calls for a genocidal war of ethnic cleansing against Jews in "Palestine."  In October 1988, in an interview to the Kuwaiti newspaper al-Anbaa, Khalil al-Quqa, who was then considered to be the aide of Sheikh Ahmad Yassin (a founder of Hamas), said: "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave." In the Jordan Times, on October 12, 1997, an article quoted Yassin as saying, "Hamas's goal is to establish an Islamic state on the ruins of Israel."

38.     Hamas achieves its stated goals through its military, political, and social wings. The military wing, the Izz el-Din al-Qassam Brigades, carries out murderous attacks within Israel, the West Bank, and Gaza.  These attacks target civilians and have resulted in deaths and injuries to many civilian men, women, and children—including U.S. nationals and Plaintiffs in this action.

39.     Hamas proudly proclaims its strategies of using violent attacks to terrorize the civilian population and to influence government officials in Israel and the United States.  Since its founding, Hamas has launched numerous violent attacks, including bombings, suicide attacks, rocket attacks, shooting, stabbings, and vehicular attacks.  These attacks have killed or injured a significant number of people.  In recent years, Hamas has also expanded its use of hostage taking and attempted hostage taking to gain leverage in negotiations with the Israeli government and to disrupt the Israeli-Palestinian peace process.  Hamas continues to support, advocate for, and

publicly endorse jihad and martyrdom in connection with attacks against Israel and its allies, including the United States.

### B.   Iran's Material Support of Hamas

40.   At all relevant times, Iran has provided material support and resources for the commission of terrorist acts, within the meaning of 28 U.S.C. § 1605A.

41.   Led by its leader Ali Khamenei, the Iranian regime has supported terror attacks by Hamas, and other Palestinian groups, against Israel, as part of its strategic aim to destroy Israel.

42.   Iran's Ayatollah Khamenei has publicly proclaimed: "[W]e regard Palestine as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people...  The Palestinian people must continue the blessed Jihad [holy war] and its standing against the enemies of Islam...  The *Hamas*, Islamic Jihad and Fatah forces must continue the struggle in a united way... But, indeed, the only solution [to the crisis in the region] is the elimination of the root of this crisis, which is the Zionist regime imposed on the region."[12]

43.   In a message issued to the Palestinian people on October 4, 2000, Khamenei called on them to wage terror attacks against Israel, stating:

> I salute the entire Palestinian nation - particularly those who engage in jihad and follow the path of Intifada. I would like to tell you that your movement will receive increasing support from Muslims and revolutionaries. And by Allah's favor, you will eventually overwhelm the occupiers. ***The Islamic Republic of Iran will proudly continue to support this holy movement*** and the most pious people of Iran will continue to pray for your success. 'If you help (the cause of) Allah, He will help you and make your foothold firm [The Holy Quran, 47:7].'"[13]

---

[12] Khabar TV, Iran (Oct. 20, 2000) (emphasis added).  ***Emphasis added throughout unless otherwise noted***.

[13] *Palestine; Selected Statements by Ayatollah Khamenei about Palestine* 102 (Islamic Revolution Publishers) (2012).

44.     In February 2012, a senior political leader of Hamas, Ismail Haniya, visited Iran.[14] During that visit, Iranian leader Khamenei hailed the Palestinian Resistance.  Haniya declared that Hamas will not recognize Israel and that it will continue fighting Israel until all the lands from the Jordanian river to the Mediterranean Sea are liberated and the Palestinian refugees will return to their lands.[15]

45.     On July 23, 2014, Khamenei declared, "From the day of its illegitimate birth, the (Zionist) regime laid the foundations for overt violence…  The solution is total armed resistance against this regime.  *The only solution is to destroy this regime*." [16]

46.     On September 9, 2015, one month before the Attack, Khamenei urged Palestinians to resume the terror attacks and reject any appeasement with Israel, stating that "in 25 years, Israel would no longer exist."  He expressed his readiness to back terror attacks against Israel until its expected destruction by declaring that "during this period, the fighting Jihadi Islamic spirit will not give the Zionists even a single moment of quiet."[17]

47.     More than mere encouragement, Iran has also provided weapons, training, and financial support to Hamas for the express purpose and intent to promote Hamas's terrorist attacks. Iran has been, and continues to be, Hamas's primary source of weapons and explosives.

---

[14] Anthony H. Cordesman, *The Gulf Military Balance: Volume I, The Conventional and Asymmetric Dimensions* 160 (Center for Strategic and International Studies) (Jan. 31, 2014).

[15] Office of the Supreme Leader (Feb. 12, 2012), http://www.leader.ir/fa/content/9144/-دیدار اسماعیل-هنیه-بار-هبر - انقلاب-اسلامی (last visited Apr. 17, 2019); *Al-Jazeera* (Qatar) (Feb. 12, 2012), http://www.aljazeera.net/news/international/2012/2/12/خامنئي-يحذر-حماس-من-التسوية (last visited Apr. 17, 2019).

[16] Middle East Media Research Institute, *Iran's Leader Khamenei: Armed Struggle Should Continue until Israel Is Destroyed by a Referendum* (July 23, 2014), https://www.memri.org/tv/irans-leader-khamenei-armed-struggle-should-continue-until-israel-destroyed-referendum/transcript.

[17] Middle East Media Research Institute, *Iranian Supreme Leader Khamenei: "In 25 Years, There Will Be No Such Thing as the Zionist Regime*" (Sept. 9, 2015), https://www.memri.org/tv/iranian-supreme-leader-khamenei-25-years-there-will-be-no-such-thing-zionist-regime/transcript.

48.     Through the IRGC and its Quds Force, Iran also actively trains Hamas terrorists in weapons usage, hostage taking, clandestine communications, and ambush preparation.

49.     In 2007, the U.S. Treasury Department designated the Quds Force as Specially Designated National under E.O. 13224, noting material support to Hamas among other terrorist groups.

50.     Iran is also a significant source of Hamas's funding.  U.S. officials have described the Iranian regime as the world's "central banker of terrorism."[18]   A February 6, 2004, Congressional report noted that Hamas received financial aid from Iran, which according to one estimation was ten percent of Hamas's annual budget.[19]  In 2014, Reuters reported that, according to diplomatic sources, Iran had previously given Hamas $250 million per year.[20]  More recent estimates suggest that Iran provides Hamas with $70 million per year.[21]

51.     Iran provides funding to Hamas through its government owned and controlled central bank, Bank Markazi, which uses other Iranian banks, like Bank Melli and Bank Saderat, as conduits.  According to the U.S. Treasury Financial Crimes Enforcement Network, and as affirmed by Congress:

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011.  In mid-2011, *the CBI transferred several billion dollars to*

---

[18] CBS News, *Rice: Iran "Central Banker" For Terror* (Mar. 16, 2006), https://www.cbsnews.com/news/rice-iran-central-banker-for-terror/; Iranians Global Network, *Iran Is "Central Banker" For Terrorism* (Oct. 4, 2018), https://iranians.global/iran-is-central-banker-for-terrorism/.

[19] Congressional Research Service, *Foreign Terrorist Organizations* 28-29 (Feb. 6, 2004), https://fas.org/irp/crs/RL32223.pdf.

[20] Reuters, *Hamas set to gain support, funding from Gaza battle* (July 18, 2014), https://www.reuters.com/article/us-palestinians-hamas-financing/hamas-set-to-gain-support-funding-from-gaza-battle-idUSKBN0FN1RI20140718.

[21] Reuters, *Top Israeli general sees increased Iran spending on foreign wars* (Jan. 2, 2018), https://www.reuters.com/article/us-iran-rallies-israel/top-israeli-general-sees-increased-iran-spending-on-foreign-wars-idUSKBN1ER0Q9.

> **designated banks, including Saderat**, Mellat, EDBI **and Melli**, through a variety of payment schemes.  In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.[22]

52.     Those transfers support Bank Markazi's illicit activities, including its support for terrorism.  In fact, Bank Markazi has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks.   For example, in an October 2007 press release, regarding the designation of Bank Saderat under E.O. 13224, the U.S. Treasury Department stated:

> Bank Saderat, which has approximately 3200 branch offices, **has been used by the Government of Iran to channel funds to terrorist organizations**, **including** Hezbollah and EU-designated terrorist groups **Hamas**, PFLP-GC, and Palestinian Islamic Jihad.  For example, from 2001 to 2006, Bank Saderat transferred $50 million from the **Central Bank of Iran** through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.[23]

53.     The Treasury Department has concluded that Hamas had "substantial assets deposited in Bank Saderat" as early as 2005 and that the bank had transferred several million dollars to Hamas between 2006 and 2007.[24]

54.     Bank Melli, owned and controlled by Iran, is also one of Iran's principal pipelines for aiding Hamas.  For example, in late May 2008, reports indicated that Iran increased its financial

---

[22] 22 U.S.C. § 8513a(a).

[23] U.S. Department of the Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx;   *see also* Treasury and State Department Iran Designations Identifier Information (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/Documents/hp644report.pdf;  U.S. Department of the Treasury, *Treasury Cuts Iran's Bank Saderat Off From U.S. Financial System* (Sept. 8, 2006), https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx.

[24] U.S. Department of the Treasury, Press Release, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx

support for Hamas to $150 million for the second half of the year and that those funds were transferred to Hamas through Bank Melli's Damascus branch.

55.     The Treasury Department also stated that, from 2002 to 2006, Bank Melli was used to send at least $100 million to the Quds Force, which provided material support to Hamas.[25]

56.     Further, in the months leading up to September 2015, shortly before the Attack, "Iran has sent suitcases of cash—literally—to Hamas's military wing in Gaza…. [Iran] handed over the suitcases [of cash], by way of couriers, directly to the leaders of [Hamas]'s military wing in the Gaza Strip."[26]

57.     Iran's material support for Hamas is long standing.  Starting in the early 1990s, Hamas staged a representative in the Iranian capital of Tehran.  Over the next 20-plus years, Iran provided material support to Hamas that has been well-documented, including in decisions of this Court.[27]

58.     During the Syrian civil war, Iran's support for Hamas waned, but nonetheless continued.  In November 2012, Ali Barake, Hamas's representative in Lebanon, stated in a television interview that Iran was the principal military and financial supporter of the majority of the Palestinian organizations in the Gaza Strip.  Barake further stressed that the ties between Hamas and Iran were strategic and continued even after Hamas adopted its position regarding the Iran-backed Syrian regime.  Barake claimed that during Israel's Operation Pillar of Defense, which

---

[25] *Id.*

[26] Times of Israel, *Boosted by nuke deal, Iran Ups funding to Hezbollah, Hamas*, (Sept. 21, 2015), https://www.timesofisrael.com/boosted-by-nuke-deal-iran-ups-funding-to-hezbollah-hamas/; *see also* Middle East Media Research Institute, *Israel Attacks Due To Arab World's Silence, We Have Supplied Gaza Resistance With Drones And Fajr 5 Missiles*, https://www.memri.org/reports/iranian-reactions-war-gaza-israels-destruction-imminent-israel-attacks-due-arab-worlds.

[27] *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 123-24 (D.D.C. 2007); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292-295 (D.D.C. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 21-22 (D.D.C. 2002).

occurred in November 2012, a senior Iranian official had contacted him daily for updates and had relayed that Iran was ready to provide material and military support during the operation, in the name of its "ideological and moral commitment" to the cause.[28]

59.     On November 21, 2012, Khaled Mashal, Chairman of the Hamas Political Bureau, thanked Iran for its role in arming and funding the residents of the Gaza Strip, which is ruled by Hamas.  At a press conference in Cairo, Egypt, shortly before the announcement of a ceasefire agreement between Israel and the Palestinian factions in Gaza, Mashal said that he was grateful for the Iranian role in aiding Gaza and thanked Iran for "arms and funding." [29]

60.     Iranian support for Hamas increased again in 2013 and 2014.  As this Court held, "The U.S. State Department's *Country Report on Terrorism 2014* notes that Iran is not shy about its willingness to finance Hamas.  'Since the conclusion of [Operation Protective Edge] … Iranian governmental officials have publicly stated their willingness to resume Iran's military support of Hamas.'  The report goes on to note that 'historically, Hamas has received funding, weapons, and training from Iran.'" [30]

61.     The U.S. Department of State confirmed in its 2014 annual report on terrorism that "Iran continued to sponsor terrorist groups around the world, principally through its Islamic

---

[28] The Meir Amit Intelligence and Terrorism Information Center, *Iranian support for the Palestinian Terrorist Organizations Iran Supports the Military Buildup of Hamas and the Palestinian Islamic Jihad in the Gaza Strip*, at 13 (Jan. 13, 2013), http://www.terrorism-info.org.il/Data/articles/Art_20459/E_267_12_1055464410.pdf.

[29] Israeli Ministry of Foreign Affairs, *Iranian Weapons in Gaza* (Nov. 22, 2012), http://mfa.gov.il/MFA/ForeignPolicy/Iran/SupportTerror/Pages/Iranian_weapons_in_Gaza_22-Nov-2012.aspx.

[30] *See Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 29-30 (D.D.C. 2017) (subsequent history omitted) (quoting Country Reports on Terrorism 2014, United States Department of State, Bureau of Counterterrorism (June 2015), https://www.state.gov/documents/organization/239631.pdf.)

Revolutionary Guard Corps-Quds Force (IRGC-QF).  These groups included Lebanese Hizballah, several Iraqi Shia militant groups, [and] *Hamas* …."[31]

62.     Further, during the 2014 Israel-Gaza conflict, IRGC-Quds Force commander, Qassem Soleimani, sent a message to Palestinian terror groups in which he pledged his support for Hamas and groups in their fight against Israel:

> Greetings to my brothers, political heads of *Hamas* and Islamic Jihad and all the Resistance groups… Greeting to commanders and operatives of [Ezzeddin] Al-Qassam (Hamas's military wing), Saraya Al-Quds [Palestine Islamic Jihad's military wing], Abu Ali Mostafa [PFLP], Nasser Salaheddin [Popular Resistance Committees], Al-Aqsa Martyrs Brigades [Fatah]… Just like in the past we have put into action our religious duty to support the resistance, we will continue this duty and will push on with our support and aid until the moment of victory, until the resistance on the ground, in the air and sea will be transformed into a hell for the Zionists.  The murderers and the mercenaries should know that we will not withhold not even for a minute our support for the resistance and our standing behind the Palestinian nation, and that we don't have a grain of hesitation in this regard.[32]

63.     In December 2014, less than a year before the Attack, the spokesman of Hamas's military wing, Abu 'Ubaida, publicly thanked Iran for its funding and weapons:

> [W]e have only to thank those whom Allah enlisted to take part in this development... *first and foremost the Islamic Republic of Iran*, which did not withhold from us *funds, weapons and [other forms of aid]* and helped us in our resistance by supplying us with missiles that pulverized the Zionist strongholds during the attacks and battles we waged against the occupier, and also supplied us with quality anti-tank missiles that crushed the legendary Zionist Merkava [tank].[33]

---

[31] U.S. Department of State, *Country Reports on Terrorism 2014*, at 8 (June 2015), https://www.state.gov/documents/organization/239631.pdf.

[32] The Jerusalem Center for Public Affairs, *Iran's IRGC Quds Force Commander: "The Palestinian Resistance Movement Will Make the Sea, the Land, and Skies into Hell for the Zionists"* (July 31, 2014), http://jcpa.org/irans-revolutionary-guard/; *Fars* (Iran) (July 31, 2014), https://www.farsnews.com/printable.php?nn=13930509000094 (in Farsi).

[33] Middle East Media Research Institute, *Hamas Senior Officials At Movement's 27th Anniversary Celebrations: We Will Not Recognize Zionist Entity Or Be Satisfied With A Palestinian State Within 1967 Borders; We Thank Iran For Supplying Us With Weapons, Missiles* (Dec. 16, 2014),

64.    Although the precise level of Iran's aid to Hamas has fluctuated over time, Iran's demonstrable patronage and material support, including during the time period leading up to the attack, has enabled Hamas to be a terror organization capable of recruiting terrorists and carrying out terrorist acts, like the Attack.

### C.    Syria's Material Support Of Hamas

65.    Syria has provided material support and resources to Hamas for the commission of terrorist acts, within the meaning of 28 U.S.C. § 1605A.

66.    Syria has long provided Hamas with material support and resources for the purpose of facilitating acts of extrajudicial killing, torture, hostage taking, and other acts of terrorism to further its policy and agenda against Israel.  That support included financial support, firearms and other weapons and materials, transport, training, safe haven and refuge from capture in Syria and in areas of Lebanon controlled by Syria.  Further, this Court has consistently found that Syria provides material support to Hamas.[34]

67.    Syria's relationship with Hamas is longstanding.  That relationship was cemented soon after Israel and the Palestinian Liberation Organization signed the Joint Declaration of Principles (also known as Oslo I) in September 1993, which launched an attempted peace process.  Then-President Hafez al Assad invited Hamas to join other Syrian-sponsored Palestinian groups in a new Damascus-based anti-peace coalition.

---

https://www.memri.org/reports/hamas-senior-officials-movements-27th-anniversary-celebrations-we-will-not-recognize-zionist.

[34] *See*, *e.g.*, *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 76 (D.D.C. 2017); *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 37 (D.D.C. 2017) (subsequent history omitted); *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 63 (D.D.C. 2011).

68.     In October 1994, Sheikh Izz al-Din Khalil, a senior Commander in Hamas's military wing, established the operational headquarters for the Hamas military wing in Damascus.

69.     In 1995, upon the arrival of Imad al Alami, a senior Hamas member, Damascus then became an important, if not the most important, center for Hamas.

70.     By 1996, Syria's support for Hamas was well-known.   Syria granted Hamas unrestricted access to Syrian-occupied Lebanon.   Hamas opened an office in Lebanon from which it began to recruit in Palestinian refugee camps.   During the mid-1990's, the Syrian regime also permitted new Hamas recruits to undergo training at Hizballah and PFLP-GC (Popular Front for the Liberation of Palestine—General Command) camps in the Beqaa Valley of eastern Lebanon, an area controlled by the Syrian military.

71.     In late May 1998, then-Hamas leader, Sheikh Yassin, visited several Middle Eastern countries and cities, including Damascus, in order to raise funds and political support for the terrorist organization.   While in Syria, Yasin met with top Syrian officials and in a speech proclaimed that Palestine could be retaken only by "resistance" and jihad, and that the suicide attacks would not stop.

72.     Bashar al-Assad assumed power in 2000, and since then, numerous Hamas attacks have occurred with the Assad regime's material support and at Syria's urging.

73.     Further, in May 2001, the Syrian government initiated the establishment of the Popular Arab Syrian Committee for Supporting the Intifada and Resisting the Zionist Plan (the "Syrian Intifada Committee").   President Bashar al Assad personally authorized the formation of this committee and appointed its chairman.   The Syrian Intifada Committee's objective was to collect donations for the support of the Intifada.   Since its establishment the Committee has

collected millions of dollars through its branches and sub-committees located throughout the Syrian provinces.

74.     In May 2002, Damascus offered Hamas direct financial aid if it revived its tactic of suicide bombings.

75.     On February 28, 2009, Musa Abu Marzouk, the Vice-Chairman of Hamas's political bureau, said in an interview to *Al Hayat,* the daily newspaper, "Syria is a friend of Hamas and a friend of the Palestinian People.  We have a presence in Syria and we receive all the support, easing [of restrictions and regulations] and the welcome."

76.     As of late 2009, the Hamas headquarters in Damascus, Syria, allocated hundreds of thousands of dollars for the budget of Al-Aqsa TV—a television station controlled by senior Hamas officials and used to spread Hamas's anti-Israel and anti-U.S. propaganda.[35]

77.     Although Syrian support for Hamas declined during the Syrian civil war, Syria's support for Hamas is so deep, long-standing, and institutionalized that the Attack was made possible because of Syria's massive support from the early to mid-1990's through its decline during the Syrian civil war.[36]

78.     Despite that declining support, Syria's continuing and current support of Hamas was recently confirmed by the U.S. Treasury Department.  On November 20, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated nine targets in an international network (pursuant to E.O. 13582) involved in a complex scheme which has been ongoing since at least 2014, through which the Iranian regime, working with Russian companies,

---

[35] *See* U.S. Treasury Department Press Release, *Treasury Designates Gaza-Based Business, Television Station for Hamas Ties* (Mar. 18, 2010), https://www.treasury.gov/press-center/press-releases/pages/tg594.aspx.

[36] *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71-72, 77 (D.D.C. 2017) ("Hamas continues to use 'the tactical know-how which Hamas gained while under Syrian protection.'").

provides millions of barrels of oil to the Syrian government.  According to the designation, the Assad regime, in turn, "facilitates the movement of hundreds of millions of U.S. dollars (USD) to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) for onward transfer to HAMAS and Hizballah."[37]

> ### D.    The Hamas Attackers

79.    A group of Hamas terrorists from Nablus planned and executed the Attack: Rajeb Ahmed Mohammed Allewa ("Rajeb"); Ihya Naif Abdallah Haj Hamed ("Ihya"); Karam Lutfi Fatahi Razek Al Masri ("Karam"); Samir Zahir Ibrahim Kusa ("Samir"), Zid Ziad Jameel Amar ("Zid"), and Amjad Aliwi ("Amjad").

80.    At some point in 2012, Rajeb joined Hamas with the intent to conduct terrorist attacks.  For a time, Rajeb merely supported Hamas's terrorist activities and participated in parades honoring the founding of Hamas.

81.    About two years later, in approximately the spring of 2014, Rajeb sought to create a new squad within Hamas to carry out terrorist attacks.  At about the same time, Rajeb recruited Ihya into Hamas.  During this time, Rajeb also attempted, unsuccessfully, to acquire weapons for Hamas to use in terror attacks.

82.    In April 2015, Amjad recruited Rajeb into a new Hamas squad with the goal of carrying out terrorist attacks on behalf of Hamas (the "Hamas Squad").  Amjad committed to obtaining weapons that Rajeb and others would use for these terrorist attacks.  Rajeb also agreed to recruit additional members to the Hamas organization at Amjad's request.

---

[37] Press Release, U.S. Dep't of the Treasury, *Treasury Designates Illicit Russia-Iran Oil Network Supporting the Assad Regime, Hizballah, and HAMAS* (Nov. 20, 2018), https://home.treasury.gov/news/press-releases/sm553-.

83.     In May 2015, Amjad provided Rajeb an M-16 rifle (the "M-16") and ammunition, which Rajeb hid for later use in terrorist attacks.  The price of the M-16 was NIS 53,000, which is approximately $14,000.00.  Later in May 2015, Amjad provided Rajeb additional ammunition for the M-16, which Rajeb gave to Ihya to hide.

84.     In June 2015, Rajeb recruited Ihya and Samir to join the Hamas Squad.  Rajeb explained to Ihya and Samir the squad's goal of launching terrorist attacks on behalf of Hamas. Both Ihya and Samir agreed to join the Hamas Squad, knowing and intending to participate in terrorist attacks.  Soon after joining the Hamas Squad, Ihya sought Rajeb's approval to recruit Karam, which was approved.  Karam joined the Hamas Squad knowing and intending to participate in terrorist attacks on behalf of Hamas.

85.     After they joined the Hamas Squad, Rajeb trained Ihya and Karam to use and maintain firearms, including the M-16 that Rajeb had hidden.  Around this time, Rajeb asked Samir to locate another firearm that could be purchased for terrorist attacks.  Samir located a firearm made by FN Herstal (the "FN") that Rajeb purchased, along with ammunition, with funds provided by Amjad.  The price of the additional gun was NIS 18,000, which is approximately $5,000.

86.     By comparison, the average monthly salary of a person living in the West Bank in 2015 was less than NIS 3,000 per month.  Without the financial backing from Hamas, the individual terrorists responsible for murder and attempted hostage taking of the Henkin family, could not have afforded the M-16 or the FN, nor carried out the Attack.

87.     In August 2015, Rajeb, Samir, and Ihya decided to carry out a terrorist attack on Israelis in retaliation for events at the Temple Mount and for an attack on a Palestinian family. Specifically, they planned to use the M-16 that Rajeb had hidden to shoot a Jewish resident in the West Bank.  Rajeb directed Samir and Ihya to scout locations for their attack.  Samir and Ihya then

drove to the Beit Furik intersection (near Nablus) and Samir shot a number of bullets into a car driven by an Israeli from a distance of about six meters.  Samir and Ihya then fled the scene.

88.     Later in August 2015, Karam wanted to launch a suicide attack.  Rajeb and Ihya began to look for locations where Karam could shoot a number of Israeli civilians and scouted several locations for such an attack.  Karam accepted their plan, but when he went to the proposed target, he noticed an Arab population that might get injured and decided to find a different target. Rajeb and Ihya then considered launching Karam's attack at the Tomb of Joseph but they decided against it because of the presence of security forces.

89.     On or about August 30, 2015, Rajeb, Samir, and Ihya met to discuss the failed attempts to find a suitable target and continued to develop their plans for another terrorist attack. Following their meeting, Samir and Ihya went out together to conduct another terrorist attack. They noticed a car being driven by Ronen Edri, an Israeli, and chased him down.  When they caught up to Edri's car, Ihya fired dozens of bullets into Edri's car at close range, after which Samir and Ihya fled the scene.  Edri was injured by flying glass but survived the attack.  Ihya briefed Rajeb about the attack the next day.

90.     On or about September 23, 2015, Samir and Ihya decided to launch another terrorist attack where they would shoot at another car and consulted with Rajeb about their plan.  Rajeb provided the M-16 and the FN that had been purchased by and for the Hamas Squad for use in the attack.  Samir and Ihya then drove to the Beit Furik Intersection where they intended to launch their attack but abandoned the attack because of the presence of security forces.

91.     At the end of September 2015, Ihya recruited Zid to the Hamas Squad and introduced him to Rajeb.  The Hamas Squad then trained Zid in the use and maintenance of firearms.

**E.      The Hamas Squad's Terrorist Attack On The Henkin Family.**

92.      At the end of September 2015, Rajeb and Ihya decided to change their tactics. Rajeb proposed that the Hamas Squad launch another shooting attack, but this time the Hamas Squad would attack and attempt to kidnap a Jewish driver.  After Ihya agreed to carry out such an attack, Rajeb sought approval from Amjad, but Amjad stated that he would need to get approval from his superiors within Hamas before he could approve it.  After Amjad got approval from his superiors, he approved the attack and agreed to assist the Hamas Squad in hiding and moving the hostage  if the attack were successful.

93.      On or about September 28, 2015, Rajeb, Ihya, and Samir met in Nablus to plan the attack and hostage taking, which they agreed would take place on October 1, 2015, near the Beit Furik Intersection.  They agreed that if they succeeded in taking a hostage, Rajeb would be in charge of the hostage.  Rajeb directed Samir to purchase restraints and dark tape to bind a hostage.

94.      Ihya further arranged through Bassam Abu Gazella ("Bassam") for Muhammed Amar ("Muhammed"), a physician, to provide any medical attention that may be required after the attack by any member of the Hamas Squad or the hostage.  Ihya and Bassam agreed to code words that would notify Bassam that he would need to drive Muhammed to Ihya to treat injuries.

95.      On October 1, 2015, Rajeb, Ihya, and Samir decided to add Karam and Zid to the Attack, and both Karam and Zid agreed to participate.  Rajeb agreed to provide Ihya with the gun he would use in the attack and the Hamas Squad would use Samir's car for the Attack.  On the evening of October 1, 2015, the Hamas Squad scouted the area of the Beit Furik Intersection to ensure there were no security forces nearby.  Zid drove to the intersection, confirmed there were no security forces in the area, and Ihya, Samir, and Karam covered the license plates on Samir's car, put on face masks and gloves, and drove to the Beit Furik Intersection to carry out the Attack.

96.     At this time, Eitam Henkin was driving his wife Naama and their four children who were then nine, seven, four, and ten months.  Samir made a u-turn and began to chase down the Henkin family's car.  When the Hamas Squad caught up with the Henkins' car, Ihya shot dozens of bullets from the M-16 into the car, injuring Eitam and forcing him to stop his car.  Ihya and Karam, both armed, approached the Henkins' car with the intent to take hostage one or more of the Henkins.  While Ihya approached the passenger door, Karam approached the driver's door of the Henkins' car.

97.     Although already shot and wounded, Eitam fought to defend his family and managed to wrestle the gun away from Karam.  Eitam was screaming for his family to run to get away from the attack.  Ihya noticed that Eitam was fighting back against Karam and shot Eitam several more times with the M-16, killing him in front of his wife and children.

98.     After Ihya murdered Eitam, Naama began to fight back to protect herself and her children.  Ihya then shot Naama several times at point blank range, murdering her in front of her young children.

99.     When Ihya was shooting Eitam, one of the bullets Ihya fired missed Eitam and struck Karam in the arm causing him to return to Samir's car.  After killing Naama, Ihya returned to Samir's car as well, and the three fled the scene.

100.    After the Attack, Muhammed came to treat Karam, whose injuries required him to be taken to a hospital.  Within days, Israeli authorities arrested Rajeb, Samir, Ihya, Karam, Amjad, and Zid for the attack.  Rajeb, Samir, Ihya, and Karam confessed to their roles in the Attack and murders of Eitam and Naama Henkin.  The Israeli court sentenced each of them to two life sentences plus 30 years for the murders, attempted kidnappings, and attempted murder of each of the Henkin family members and other crimes.

101.    The Hamas Squad remained defiant throughout their trials.  According to the Israeli court, none of the Hamas Squad members expressed any remorse and all were proud of their actions.

102.    In his last statement to the Israeli court, Rajeb stated that he carried out the attack in the name of the Izz ad-Din al-Qassam brigades, the military wing of Hamas.  Similarly, Ihya, who smiled throughout the trial and the discussion of the Attack, was confident that the Izz ad-Din al-Qassam brigades would ensure that he would not be held "captive" for long.  Karam also stated that he believed he would be home soon as well.

**F.    Hamas Proclaims Its Support For The Attack And The Attackers.**

103.    Following the Attack, the Qassam brigades, the military wing of Hamas, published vivid details of "Itamar Operation" on its website, taking responsibility for the attack:

> Operation type: armed ambush.
> Place of operation: near usurped "Itamar" in Nablus.
> Date of Operation: 1/10/2015
> Losses of the enemy: the killing of Zionist occupiers.
>
> The details of the operation:
>
> With the sunrise of the glory of the first sun of October of 2015, and one month after the Zionists burned the Dawabshe family, the heroes were waiting under cover to attack their target on the highway, near the usurped "Itamar" near the city of Nablus in the occupied West Bank.
>
> They did not have to wait long.  The eyes of the heroes were furious when they saw the car of the usurpers.  They drove behind them and when the car with the usurpers came next to their car, the knights fired a barrage of fire towards the target.  The Zionist car stopped after having been hit by the gunfire.
>
> The Mujahideen were not satisfied with this and despite the difficulty of the situation their courage allowed them to get out of the car until they reached the car of the usurpers, and they opened the car to finish off those remaining persons alive in the vehicle, but the Mujahideen did not confront the children who were in the car, and withdrew safely leaving the enemy flouncing upside down.

The rifles of the Qassam Brigades killed two Zionists in this operation, Eitam Henkin, reserve officer in the Matkal unit, an intelligence officer and a rabbi, and his wife, the deceased, "Naama Hakinin" [sic] the daughter of a senior officer in the Matkal unit, who participated in the failed attempt to liberate the captive soldier Nachshon Wachsman from the Qassam Brigades in 1994.[38]

104.    Hamas's Al-Qassam Brigades spokesperson, Abu Obeida, responded to the attack in a tweet: "We bless the heroic operation against the Zionist usurpers.  It is a natural response to the occupation and settlers crimes in Jerusalem and the West Bank and will not Be the last, God willing."[39]

105.    Dr. Sami Abu Zuhri, a spokesman for Hamas stated: "The decisions of Netanyahu and the Israeli cabinet tonight against the demonstrators and the executors of the operations in the West Bank will not succeed in extinguishing the public interest in the West Bank, and the announcement of the occupation's arrest of the Nablus cell is a declaration of honor for our people and resistance.  This cell is not the first and will not be the last."[40]

106.    Hossam (Husam) Badran, former leader of Hamas's military wing in the northern West Bank (currently exiled to Qatar where he acts as a media spokesman for the Hamas movement), issued a press release that stated:

We congratulate the heroic operation carried out by the resistance in the West Bank, which led to the killing of two settlers and injuring others east of Nablus.  We see in it a real response to the crimes of the occupier, that is integral to the rising popular movement in all areas of the occupied West Bank.  And this occupier is deluded if he thought that our people will not use all of its capabilities to deter him from continuing to enter the Al-Aqsa Mosque.[41]

---

[38] Translated from https://www.alqassam.net/arabic/battles/details/83; *see also* https://www.alqassam.net/arabic/videos/index/1158.

[39] Ram News Agency, *Abu Obeida: Nablus operation will not be the last* http://www.rumonline.net/print.php?id=231378 (translation).

[40] http://hamas.ps/ar/post/3751/

[41] Translated from October 1, 2015 Press Release.

107.    By providing myriad avenues along which to direct, support, incite and fund terrorist activities, Defendants Iran, IRGC, MOIS, Bank Markazi, Bank Melli, Bank Saderat, and Syria provided material support for Hamas.  Each Defendant, collaborated, designed, directed, incited, financed, provided material support, aided, abetted, conspired, and executed acts of terror with Hamas.  Defendants knew or should have known that the material support would be used to fund, incite, and perpetrate terrorism against Jews, Israelis, Americans and others in Israel, as this was the stated goal of Hamas—a goal shared by Defendants.  As such, Defendants are directly, jointly, and severally liable for the injuries suffered by Plaintiffs and should, therefore, be held accountable.

## COUNT I

### WRONGFUL DEATH
### (Under 28 U.S.C. § 1605A(c) or, in the alternative, the laws of the District of Columbia or Israeli Law)

108.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

109.    Iran is a foreign state that, since 1984, has been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

110.    Syria is a foreign state that, since 1979, has been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

111.    The attempted kidnapping and murder was an act of hostage taking and extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

112.    Plaintiffs, are the Estate of Eitam Henkin, the minor children of Eitam Henkin, I.Z.H., M.H.H., N.E.H., and N.Y.H., (by their guardians *ad litem*), and the Estate of Eitam's spouse, Naama Henkin.

113.    At the time of the attempted hostage taking and extrajudicial killing, Eitam Henkin was a national of the United States within the meaning of 28 U.S.C. § 1605A(c)(1).

114.    Defendants provided material support and resources to Hamas, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the attempted hostage taking against Eitam Henkin and his serious injuries, pain and suffering, and extrajudicial killing.

115.    As described in the foregoing paragraphs, after being shot and wounded by one of the Hamas terrorists and suffering serious injury, but surviving, Eitam fought desperately to free his wife and four children, as he struggled with his attackers.  Eitam was then murdered, knowing that his family faced grave danger at the hands of terrorists.

116.    His wife, Naama Henkin, survived the attempted kidnapping and murder of her husband before being murdered by the same terrorists.

117.    At the time of his death, decedent Eitam Henkin was 31 years of age, a doctoral student at University, a husband and young father of four minor children, physically and emotionally healthy, and financially providing for his family.

118.    The attempted kidnapping and murder of Eitam Henkin caused his estate, his surviving children I.Z.H., M.H.H., N.E.H., and N.Y.H. (minors by their guardians *ad litem*), and his spouse Naama Henkin (by her Estate) severe  physical and emotional pain and suffering, severe emotional distress and mental anguish, pecuniary loss including loss of income and earning capacity, loss of guidance companionship and society, loss of consortium, and solatium.

119.    Defendants personally and/or through their subdivisions, agents, and co-conspirators, willfully and deliberately authorized, organized, planned, aided, abetted, induced and conspired to commit, provide material support for and executed the attempted kidnapping and murder of Eitam Henkin.

120.     Defendants' behavior constituted a breach of legal duties to desist from committing, or aiding, abetting, authorizing, encouraging, or conspiring to commit acts of extrajudicial killing and hostage taking, and to refrain from intentionally, wantonly, and/or negligently authorizing or causing the infliction of death, physical injuries, mental anguish, and harm to persons such as the Plaintiffs, including the decedent.

121.     Defendants' actions were willful, malicious, intentional, wrongful, unlawful, negligent, and/or reckless and were the direct and proximate cause of the attempted hostage taking and murder of Eitam Henkin.

122.     Defendants are therefore jointly and severally liable under 28 U.S.C. § 1605A(c) for the full amount of Plaintiffs' damages.

123.     Defendants' conduct that caused the wrongful death of Eitam Henkin was criminal, outrageous and extreme, wanton and willful, malicious and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## COUNT II

### SURVIVAL DAMAGES ON BEHALF OF THE ESTATE OF EITAM HENKIN
**(Under 28 U.S.C. § 1605A(c) or, in the alternative,
the laws of the District of Columbia or Israeli Law)**

124.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

125.     The attempted hostage taking and extrajudicial killing of Eitam Henkin, caused by Defendants' actions, caused Eitam Henkin and his estate severe injury including pain and suffering prior to his death, pecuniary loss and loss of income.

126.     From the time of the attempted hostage taking until his death, Eitam suffered great conscious pain and physical and mental anguish as he tried to protect himself and his family from the attacking terrorists.  After being shot and wounded by one of the terrorists and suffering serious

injury, but surviving, Eitam fought desperately to free his wife and four children, as he struggled with his attackers.  Eitam was then murdered, knowing that his family faced grave danger at the hands of terrorists.

127.     Defendants are jointly and severally liable to the Estate of Eitam Henkin for the full amount of the decedent's damages in such sums as may hereinafter be determined.

128.     Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

**COUNT III**

**LOSS OF SOLATIUM**
**(Under 28 U.S.C. § 1605A(c) or, in the alternative,**
**the laws of the District of Columbia or Israeli Law)**

129.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

130.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendants, their subdivisions, agents, and co-conspirator, each of the Plaintiffs suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victim.  Plaintiff's minor children continue to suffer severe mental anguish at the loss of their father and mother at the hands of the terrorists.

131.     Accordingly, each of the Plaintiffs bring claims for loss of solatium against Defendants pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the law of the District of Columbia and/or the State of Israel.

132.     Defendants are jointly and severally liable for the full amount of Plaintiffs' damages.

133.     Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## COUNT IV

### INTENTIONAL INFLICTION OFEMOTIONAL DISTRESS
**(Under the laws of the District of Columbia or Israeli Law)**

134.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

135.    Defendants' conduct was willful, extreme, outrageous, dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

136.    Defendant intended to and did, in fact, terrorize the Plaintiffs and cause them extreme and egregious emotional distresses by having them witness the attempted kidnapping, serious injury, and murder of their husband and father, respectively.

137.    Naama Henkin, who was present at the attack, suffered terror, severe mental anguish, bereavement and grief as she witnessed the injuries, and pain inflicted on her husband as he tried to fight off the attackers, before she too was viciously murdered by the same terrorists.

138.    As a result of the Henkin children's experience of violence, witnessing the sight of their father's suffering from critical injuries and subsequent death, compounded by subsequently witnessing the death of their mother, they experienced terror, grief, severe mental anguish, serious emotional and psychological trauma that has affected, and will continue to affect, their daily lives. As the Israeli court recognized, although the children were not shot, "the suffering caused to their young souls because of the tragic event and its results, run deep and cannot be estimated."[42]

139.    Defendants are jointly and severally liable for the full amount of Plaintiffs' damages.

---

[42] *The Military Prosecutor v. Karam Lufty Fatchi Razak*, Court Tribunal in Samaria, Docket No. 3220/15, June 22, 2016.

140.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## COUNT V

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
**(Under the laws of the District of Columbia or Israeli Law)**

141.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

142.    The attempted hostage taking and murder of Eitam Henkin were foreseeable consequences of providing material support and aid to Hamas and supporting Hamas's efforts to disrupt the Israeli-Palestinian peace process.

143.    The actions of Defendants were willful, extreme, outrageous and/or grossly negligent, and were dangerous to human life and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

144.    Defendants' conduct terrorized the Plaintiffs and caused them egregious emotional distress.

145.    Defendants are jointly and severally liable to the Plaintiffs, heirs, survivors, of Eitam Henkin, namely the minor children I.Z.H., M.H.H., N.E.H., and N.Y.H. (by their guardians *ad litem*), and the estate of Eitam's spouse, Naama Henkin, for the full amount of the damages.

146.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## COUNT VI

### CIVIL CONSPIRACY
**(Under the laws of the District of Columbia or Israeli Law)**

147.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

148.   Defendants knowingly, willingly, and recklessly conspired, agreed and acted in concert with each other and with Hamas in a common plan and designed to cause acts of international terrorism, extrajudicial killing, hostage taking, and personal injury against Jews, Israelis, Americans and others in Israel, including the attempted kidnapping and murder of Eitam Henkin, which harmed Plaintiffs.

149.   As such, Defendants are directly, jointly, and severally liable for the injuries suffered by Plaintiffs and should, therefore, be held accountable.

150.   As a result of the attempted kidnapping and murder of Eitam Henkin, resulting from and facilitated by the conspiracy between Defendants and Hamas, Plaintiffs suffered the damages enumerated herein.

151.   Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

152.   Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## COUNT VII

### AIDING AND ABETTING
### (Under the laws of the District of Columbia or Israeli Law)

153.   The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

154.   Defendants provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A and other substantial aid and assistance, in order to aid, abet, facilitate, and cause the commission of acts of international terrorism, extrajudicial killing, torture, hostage taking, personal injury, and pain and suffering, including the attempted kidnapping and murder of Eitam Henkin, which harmed the Plaintiffs.

155. As a result of the attempted kidnapping, shooting and murder which was caused and resulted from and facilitated by Defendants' provision of material support and resources and other acts of aiding and abetting Hamas, Plaintiffs suffered the damages enumerated herein.

156. Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

157. Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## COUNT VIII

### VICARIOUS LIBLITY/RESPONDEAT SUPERIOR AGAINST THE IRANIAN DEFENDANTS
**(Under 28 U.S.C. § 1605A(c) or, in the alternative, the laws of the District of Columbia or Israeli Law)**

158. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

159. At all relevant times, Defendants MOIS, IRGC, Bank Melli, Bank Markazi and Bank Saderat were subdivisions and/or agents of Iran acting within the scope of their agency to further the interests of Defendant Iran.

160. Defendant Iran authorized, directed, supported, ratified, and/or condoned the conduct of Defendants the MOIS, IRGC, Bank Melli, Bank Markazi, and Bank Saderat.

161. Because Defendant routinely relied upon and controlled its subdivisions and agents for providing material support and resources to Hamas, to advance each other's terrorist aims and objectives, Defendants are equally and vicariously liable for the injuries caused by each other, and their agents.

162. Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages.

163.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful malicious, and constitutes a threat to the public warranting an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Enter judgment, jointly and severally, against all Defendants, for compensatory damages in the amount of not less than SIXTY MILLION DOLLARS ($60,000,000) plus costs;

B.  Award punitive damages, jointly and severally, against all Defendants in the amount of not less than THREE HUNDRED MILLION DOLLARS ($300,000,000);

C.  Pre-judgment and Post-judgment interest at the maximum rates allowable by law;

D.  Any other and different relief that the Court deems just and necessary.

Dated:   April 24, 2019                    Respectfully submitted,

                                           /s/ Michael A. Petrino
                                           Jonathan E. Missner
                                           Andrew M. Beato
                                           Edward H. Meyers
                                           Michael A. Petrino
                                           **STEIN MITCHELL BEATO & MISSNER LLP**
                                           901 15th Street, N.W.
                                           Suite 700
                                           Washington, D.C. 20005
                                           Tel: (202) 737-7777
                                           Fax: (202) 296-8312
                                           jmissner@steinmitchell.com
                                           abeato@steinmitchell.com
                                           emeyers@steinmitchell.com
                                           mpetrino@steinmitchell.com

                                           Gavriel Mairone
                                           MM~LAW LLC
                                           980 North Michigan Avenue, Suite 1400
                                           Chicago, IL 60611
                                           Tel: (312) 253-7444
                                           Fax: (312) 275-8590
                                           taxlaw@mm-law.com

                                           *Counsel for Plaintiffs*