## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JUDAH HERZEL HENKIN**, et al., | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:18-cv-1273-RCL** |
| **ISLAMIC REPUBLIC OF IRAN**, et al., | |
| *Defendants.* | |
| | |
| **ESTATE OF EITAM HENKIN**, et al., | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:19-cv-1184-RCL** |
| **ISLAMIC REPUBLIC OF IRAN**, et al., | |
| *Defendants.* | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The following Findings of Fact and Conclusions of Law concern two separate but related lawsuits arising out of the same October 1, 2015 terror attack. The first case is Civil Action No. 1:18-cv-01273 ("Case 1273"), which is brought by the parents and siblings of Eitam Henkin. Case 1273 includes claims only against Defendants Iran and Syria. The second case is Civil Action No. 1:19-cv-01184 ("Case 1184"), which is brought on behalf of the Estate of Eitam Henkin, the Estate of Na'ama Henkin, and the four minor Henkin children. Case 1184 is against Defendants Iran, Syria, the Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Intelligence and Security ("MOIS"), Bank Saderat, Bank Melli, and Bank Markazi. Despite the differences in

1

defendants, these cases ultimately concern the same real-world transaction—the October 1, 2015, terrorist attack that killed Eitam and Na'ama Henkin.

## FINDINGS OF FACT

**A.     Procedural History**

*(a) Parties*

1.  Rabbi Judah Herzl Henkin (now deceased), Anne Chana Henkin, Aderet Rivka Henkin, Eliashir Elijah Henkin, Jacob Bechor-Shalom Henkin, Joseph Gil Henkin, Taama Freida Henkin Yaakovson are the Plaintiffs for Case 1273.

2.  The Estate of Eitam Henkin, the Estate of Na'ama Henkin, and Eitam and Na'ama's four minor children (I.Z.H., M.H.H., N.E.H., and N.Y.H.) are the Plaintiffs for Case 1184.

3.  Eitam Henkin was a dual Israeli and United States citizen when he died, but he lived in Israel his entire life. Strous Decl. 28, ECF No. 56.

4.  Na'ama Henkin was not a United States citizen when she died and was domiciled in Israel prior to the attack. Strous Decl. 20, ECF No. 56.

5.  Their four children are not United States citizens and were domiciled in Israel prior to the attack. *Id.*

6.  The parents of Eitam Henkin—Rabbi Henkin and Anne Henkin—are both United States citizens, and were United States citizens living in Israel at the time of the attack. Anne Chana Henkin Decl. ¶ 2.

7.  The siblings of Eitam Henkin—Aderet, Eliashir, Jacob, Joseph, and Taama—are all currently United States citizens and were United States citizens living in Israel at the time of the attack. Aderet Henkin Decl. ¶ 2; Eliashir Elijah Henkin Decl. ¶ 2; Jacob Bechor-

Shalom Henkin Decl. ¶ 2; Joseph Gil Henkin Decl. ¶ 2; Taama Freida (Henkin) Yaakovson Decl. ¶ 2.

8.  The Islamic Republic of Iran ("Iran"), Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence and Security ("MOIS"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), Bank Saderat Iran ("Bank Saderat"), and the Syrian Arab Republic ("Syria") are the Defendants.

   *(b) Complaints*

9.  Plaintiffs in Case 1273 and Case 1184 both filed claims under the terrorism exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.

10. In Case 1184, the Estate of Eitam Henkin brought a direct claim under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c), against all Defendants, stemming from his killing and attempted hostage taking by Hamas terrorists. However, Plaintiffs only asserted Count VIII of vicarious liability/respondeat superior against the Iranian Defendants.

11. Similarly, in Case 1273, the parents and siblings of Eitam Henkin brought this suit under 28 U.S.C. § 1605A(c), stemming from the death of Eitam Henkin. Case 1273 was only filed against Defendants Iran and Syria.

12. In Case 1184, the Estate of Na'ama Henkin and the four surviving Henkin children are not U.S. citizens and cannot proceed directly under 28 U.S.C. § 1605A(c). They asserted their claims under District of Columbia law or, in the alternative, Israeli law. They have brought claims against the Defendants for the harm they suffered from the murder of their husband and father, Eitam Henkin.

13. The Estate of Eitam Henkin has also asserted claims under District of Columbia law or, in the alternative, Israeli law.

    *(c) Service*

       *(i)    1273 Case*

14. Prior to requesting diplomatic assistance for service of process on Iran, Plaintiffs exhausted the ordinary service provisions under §§ 1608(a)(1), (2), and (3).

15. Defendant Iran was served on December 19, 2018, with the Complaint, Summons, and Notice of Suit by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). Return of Service, ECF No. 14.

16. Iran did not answer or appear within the required time period. Entry of Default, ECF No. 17.

17. Prior to requesting diplomatic assistance for service of process on Syria, Plaintiffs exhausted the ordinary service provisions under §§ 1608(a)(1), (2), and (3).

18. Defendant Syria was served on January 22, 2019, with a copy of the Summons, Complaint, and Notice of Suit by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). Return of Service, ECF No. 15.

19. Syria did not answer or appear within the required time period. Entry of Default, ECF No. 17.

       *(ii)    1184 Case*

20. Defendants Iran, the IRGC, and the MOIS were first served via U.S. mail on May 29, 2019. Certification, ECF No. 8. Those summonses were returned unexecuted. Summons Returned, ECF Nos. 11, 12, 13. Plaintiffs subsequently effected service via the U.S. State

Department under § 1608(a)(4), and service was completed on September 23, 2019. Affidavit, ECF No. 28.

21. Defendants Bank Markazi, Bank Melli, and Bank Saderat were served by mail, and service was completed by June 20, 2019. Return of Service, ECF Nos. 14, 15, 16.

22. Defendant Syria was first served via DHL on July 31, 2019. Certificate, ECF No. 20. Syria refused to accept delivery and Plaintiffs filed a notice of failed service. Summons Returned, ECF No. 24. Plaintiffs subsequently effected service via the U.S. State Department under § 1608(a)(4), and service was completed on January 13, 2020. Return of Service, ECF No. 32.

23. Syria was the last Defendant served, and its answer was due 60 days after service, i.e., March 13, 2020. Return of Service, ECF No. 32.

24. None of the Defendants filed an answer, responsive pleading, or otherwise appeared.

    *(d) Default Judgment Proceedings*

        *(i)    1273 Case*

25. On May 6, 2019, the Clerk of Court entered default against Iran and Syria. Entry of Default, ECF No. 17.

26. On August 27, 2020, Plaintiffs filed their Motion for Default Judgment Against Iran and Syria and Memorandum in Support.

27. On January 12, 2021, and January 14, 2021, the Court held a joint evidentiary hearing with the Plaintiffs from Case 1184. Min. Entry, January 12, 2021, Min. Entry, January 15, 2021.

        *(ii)    Case 1184*

28. On April 1, 2020, Plaintiffs filed their Motion for Default Judgment Against All Defendants and Memorandum in Support. Affidavit, ECF Nos. 33 and 33-1.

29. On April 6, 2020, the Clerk of Court entered defaults as to all Defendants except for Bank Saderat. Entry of Default, ECF Nos. 36-40. The omission of Bank Saderat appears merely to have been a clerical oversight. Plaintiffs filed a Supplemental Affidavit for Default against Bank Saderat, and the Clerk of Court entered default on October 26, 2020. Entry of Default, ECF No. 44.

30. On September 17, 2020, the Court held a Status Conference in this case during which it conveyed to Plaintiffs that the Court intended to rule first on liability only.

31. On November 23, 2020, Plaintiffs filed a Motion for Default Judgment as to the liability of all Defendants and Memorandum in Support. Motion for Default, ECF No. 46.

**B.    The January 12 & 14, 2021 Hearing**

32. On January 12 and 14, 2021, the Court held a joint evidentiary hearing with the Plaintiffs from both Case 1273 and Case 1184. Scheduling Order, ECF No. 50.

33. At that hearing, the Court heard live testimony from four experts—Dr. Ronni Shaked, Col. Arieh Spitzen (ret.), Dr. Patrick Clawson, and Dr. Matthew Levitt.

34. Dr. Shaked[1] is currently a researcher at the Truman Research Institute for Peace at the Hebrew University of Jerusalem. Day 1 Tr. 27:20-23 (Shaked). He previously worked for the Israeli Security Agency ("ISA"), where he took many different training courses on the subject of terrorism. Day 1 Tr. 28:5-15 (Shaked). Eventually he was promoted to commander of the Jerusalem ISA. *Id.*

---

[1] The Court qualified Dr. Shaked as an expert on Hamas at the joint hearing on this matter. *See* Day 1 Tr. 42:5-13. The Court here reiterates that finding, since Dr. Shaked's specialized knowledge helped the trier of fact understand the evidence and determined facts in issue, Dr. Shaked based his testimony on sufficient facts and data, his method of attribution is the product of reliable principles and methods, and because the Court finds that he has reliably applied the principles and methods to the facts of this case. *See* Fed. R. Evid. 702 (a)–(d).

35. Additionally, Dr. Shaked worked at the Yedioth Aharanoth newspaper for about 30 years, focusing on terrorism. Day 2 Tr. 28:21-29:7 (Shaked). During this experience, he met with many terrorists, specifically those belonging to fundamentalist Islamic organizations, including Hamas. *Id.* Dr. Shaked has authored or co-authored five books on aspects of Palestinian terrorism, has been qualified to provide and has provided expert testimony in approximately ten different terrorism cases in U.S. federal court. Day 1 Tr. 29:19-23 (Shaked); Shaked Decl. ¶ 13.

36. Col. Arieh Spitzen is a retired Colonel in the Israeli Defense Forces (IDF). (Spitzen Decl., Appx. A.) He served for thirty years as a member of the IDF's Palestinian Affairs Department in the West Bank, including as Section Head of the Research Section of the Advisor for Arab Issues in the Military Government in the West Bank. Day 1 Tr. 75:3-83:13 (Spitzen); Spitzen Decl., Appx A; Ex. 5 (slides 2-3). He was also a member of the negotiation team for the Oslo Peace Accords, and Department Head for Palestinian Issues in the West Bank. Day 1 Tr. 75:3-83:13 (Spitzen); Spitzen Decl., Appx A; Ex. 5 (slides 2-3).

37. Col. Spitzen[2] is an expert in the socioeconomic and political conditions of the Palestinians in the West Bank and the Gaza Strip, and an expert in the primary Palestinian terror group including Hamas. Day 1 Tr. 84:23-85:2. He has been qualified as an expert in ten terrorism cases in federal court. Spitzen Decl. 2 & Appx A.

---

[2] The Court qualified Col. Spitzen as an expert witness on Hamas at the joint hearing on this matter. *See* Day 1 Tr. 85:3-11. The Court here reiterates that finding, since Col. Spitzen's specialized knowledge helped the trier of fact understand the evidence and determined facts in issue, Col. Spitzen based his testimony on sufficient facts and data, his method of attribution is the product of reliable principles and methods, and because the Court finds that he has reliably applied the principles and methods to the facts of this case. *See* Fed. R. Evid. 702 (a)–(d).

38. Dr. Patrick Clawson[3], PhD, is the Director of Research at the Washington Institute for Near East Policy. Clawson Decl. ¶ 2. He is an expert in Iran, specifically in Iran's support for terrorism, including Hamas, and Iran's politics, economics, and banking system, and has written and spoken exclusively on these topics. Clawson Decl. ¶¶ 1, 7-10.

39. He has created presentations about the foreign and economic policy of Iran, including its support for terrorism, and about U.S. policy towards Iran, at conferences sponsored by, amongst other organizations, the Iranian Foreign Ministry's Institute for political and International Studies in Tehran, Iran. Clawson Decl. ¶ 8. Dr. Clawson has submitted written testimony and testified live numerous times in terrorism cases before this Court. Clawson Decl. ¶ 6.

40. Dr. Matthew Levitt[4], PhD, is the Senior Fellow and Director for the Stein/Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. Levitt Decl. 1-2. He is currently an adjunct professor at Georgetown University, and was formerly the Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury from November 2005 through January 2007. *Id.*

41. Dr. Levitt has testified many times before the United States Senate and House of Representatives as an expert on international terrorism, U.S. policy toward the Middle East,

---

[3] The Court qualified Dr. Clawson as an expert on Iran at the parties' joint hearing on this matter. *See* Day 2 Tr. 52:18-22. The Court here reiterates that finding, since Dr. Clawson's specialized knowledge helped the trier of fact understand the evidence and determined facts in issue, Dr. Clawson based his testimony on sufficient facts and data, his method of discerning information about Iran, its terror-sponsorship activities, and its banking system is the product of reliable principles and methods, and because the Court finds that he has reliably applied the principles and methods to the facts of this case. *See* Fed. R. Evid. 702 (a)–(d).

[4] The Court qualified Dr. Levitt as an expert on Iran and Syria at the parties' joint hearing at this matter. Day 2 Tr. 52:18-22. The Court here reiterates that finding, since Dr. Levitt's specialized knowledge helped the trier of fact understand the evidence and determined facts in issue, Dr. Levitt based his testimony on sufficient facts and data, his method of discerning information about Iran and Syria, their terror-sponsorship activities, and Iran's banking system is the product of reliable principles and methods, and because the Court finds that he has reliably applied the principles and methods to the facts of this case. *See* Fed. R. Evid. 702 (a)–(d).

countering violent extremism, and terrorist financing and sanctions policy. *Id.* at 5. He has also submitted written testimony and testified live in terrorism cases before this Court. *Id.*

**C.   Hamas**

*(a) Background*

42. This Court is familiar with the Foreign Terrorist Organization ("FTO") Hamas and has addressed Hamas attacks in numerous FSIA cases. *See, e.g. Steinberg v. Islamic Republic of Iran*, 2019 WL 6117722 (D.D.C. Nov. 18, 2019) (Lamberth, J); *Roth v. Syrian Arab Republic*, 2008 WL 4680270 (D.D.C. Sept. 28, 2018) (Lamberth, J.); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012) (Lamberth, J.).

43. Hamas, both an acronym for Harakat al-Muqawama al-Islamiya (Islamic Resistance Movement) and an Arabic word meaning "zeal," is a Palestinian Islamist group that emerged in 1987 as an outgrowth of the Palestinian branch of the Egypt-based Muslim Brotherhood. Shaked Decl. ¶¶ 33-34; Levitt Decl. 7; Spitzen Decl. 4.

44. Hamas's goal is to eliminate the State of Israel and establish in its place an Islamist state in all of what was once British Mandatory Palestine—a territory that today comprises Israel, the West Bank, and the Gaza Strip. Day 2 Tr. 88:14-16 (Levitt); Shaked Decl. ¶¶ 34, 38. Hamas rejects a permanent peace with Israel, which places Hamas at odds with Israel and the Palestinian Authority. Day 2 Tr. 88:17-20 (Levitt); Levitt Decl. 7, 16.

45. To accomplish its goals, Hamas engages in activities ranging from social welfare and political activities to militant and terrorist activities. Day 2 Tr. 88:21-89:1 (Levitt).

46. In 2006, Hamas won the general Palestinian Authority elections, violently expelled the Palestinian Authority from Gaza, and took complete control of the Gaza Strip in 2007.

Spitzen Decl. 5. Hamas continues to maintain absolute political and military control of the Gaza Strip. *Id.*

47. Hamas also operates the *da'wa*—a network of proselytizing and fundraising through mosques and social-service institutions. Levitt Decl. 8.

48. Funds raised through the *da'wa* are sometimes used for peaceful purposes, such as hospitals, schools, mosques, and sports leagues; however, money donated to any portion of Hamas can free up additional funding for terrorist-related activities. Levitt Decl. 9, 12.

49. The *da'wa* network also provides a means to identify new Hamas recruits, particularly through their sports clubs. Levitt Decl. 10-11.

50. *Da'wa* also sponsors schools and summer camps that create the opportunity to instill these radical messages into children starting at a young age. Levitt Decl. 8.

51. Finally, the well-funded *da'wa* network provides Hamas members with regular employment so that they can maintain a salary, have an ostensible "cover" for their terrorist activities, and also frees them to focus on furthering Hamas's violent ends. Levitt Decl. 10-12.

52. Hamas commits terror attacks through its military wing, the Izz a-Din al-Qassam Brigades. Spitzen Decl. 7.

53. The Izz a-Din al-Qassam Brigades were founded at the start of the 1990s, and currently have more than thirty-thousand terrorists. Spitzen Decl. 5 n.3. They are responsible for perpetrating terror attacks for Hamas and are directly subordinate to top Hamas leadership. *Id.*

54. Since its founding, Hamas has committed countless violent attacks against Israel's military and civilians, including bombings, rocket and mortar attacks, shootings, stabbings,

kidnappings and attempted kidnappings, and car-ramming attacks. Day 2 Tr. 89:9-20 (Levitt); Levitt Decl. 16.

55. Hamas's terrorist acts primarily target Israel, but they have also targeted the Palestinian Authority, killing many fellow Palestinians. Day 2 Tr. 89:1-8 (Levitt).

56. Additionally, Hamas's attacks are often efforts to terrorize the general population, targeting locations such as buses, rail stops, restaurants, and other busy civilian venues. Levitt Decl. 16-17. As a result, Hamas's attacks have killed civilians from many nations, including the United States. Levitt Decl. 16.

*(b) The Importance of Kidnapping to Hamas*

57. Kidnapping Israelis to trade them for the release of Palestinian prisoners is an especially important tactic for Hamas. Day 1 Tr. 48:14-10 (Shaked); Day 2 Tr. 9:2-12:21 (Spitzen); Levitt Decl. 17.

58. Prisoners held in Israeli jails are "a very, very sensitive matter" for Palestinian society as a whole, and especially for Hamas. Day 2 Tr. 9:6-8 (Spitzen). Hamas leaders frequently mention prisoners and "their duty and obligation to get them released." Day 2 Tr. 9:8-11 (Spitzen).

59. A successful abduction and prisoner exchange deal alleviates pressure coming from Hamas prisoners inside the jails, and it is seen as very credible to Hamas's followers because it shows that they are keeping their promises to protect their members. Day 2 Tr. 12:4-10 (Spitzen).

60. Kidnappings allow Hamas to carry out an attack "literally targeting Israelis and, therefore, Israeli society, but also messaging against their Palestinian political rivals, presenting

themselves as being willing and able to, at risk to themselves, take bold action to secure the release of Palestinian prisoners." Day 2 Tr. 89:21-90:3 (Levitt).

61. Prisoner exchanges build "political support [for Hamas] at the expense of their political rivals." Day 2 Tr. 90:14-17 (Levitt).

62. Prisoner releases also release some of Hamas's highly trained operatives. Day 2 Tr. 90:16-17 (Levitt).

63. For example, in October 2011, Israel released more than 1,000 Palestinian prisoners in exchange for one Israeli soldier, Gilad Shalit, who was kidnapped in Gaza in June of 2006. Day 2 Tr. 10:13-23 (Spitzen); Levitt Decl. 17. The release of these prisoners, some of whom were seasoned terror operatives who had murdered innocent civilians, represented an influx of "new blood coming into the Hamas organization" and "energized its terrorist aspect, especially the Izz a-Din al-Qassam Brigades." Day 2 Tr. 10:13-11:7 (Spitzen).

64. As another example, on June 12, 2014, Hamas kidnapped three teenage Israelis, including one Israeli-American dual citizen, but the kidnapping failed and the kidnappers murdered the three teenagers. Day 2 Tr. 90:24-91:13 (Levitt); Levitt Decl. 17.

65. After being deemed responsible for the attack, Hamas launched thousands of mortars and rockets into Israel from Gaza, killing six civilians and injuring approximately 1,600, including 270 children. Day 2 Tr. 91:10-12 (Levitt); Levitt Decl. 19. In response, Israel launched Operation Protective Edge in July 2014—an approximately seven-week military offensive against Hamas in Gaza. Levitt Decl. 19.

66. As part of Operation Protective Edge, Israel uncovered numerous tunnels used for staging attacks—including kidnappings. Day 2 Tr. 91:14-24 (Levitt); Levitt Decl. 22. Some of these tunnels cost between several hundred thousand and as much as $3 million. Day 2 Tr.

92:6-14 (Levitt). Tunnels like these were used to kidnap Gilad Shalit, and some were dug right up to Israeli civilian communities. Day 2 Tr. 92:18-23 (Levitt).

67. Furthermore, Israeli intelligence claimed that in the year preceding Operation Protective Edge, it foiled 64 kidnapping plots, most of which were plotted by Hamas. Levitt Decl. 19.

68. Kidnapping missions which lead to prisoner exchanges are extremely important to Hamas.

   *(c) Hamas's Terrorist Designations*

69. The United States has long-recognized Hamas as a terrorist organization.

70. In 1995, the United States designated Hamas as a Specially Designated Terrorist; in 1997, the United States designated Hamas as a Foreign Terrorist Organization ("FTO"); and in 2001, the United States designated Hamas as a Specially Designated Global Terrorist ("SDGT"). Day 2 Tr. 93:6-13 (Levitt); Levitt Decl. 6; Shaked Decl. ¶ 39. All of these designations are still in place today. Levitt Decl. 6.

71. A SDGT designation bars anybody from doing any business with Hamas, and it freezes any funds they may have in the United States. Day 2 Tr. 93:8-13 (Levitt). As a result, anyone who does business with Hamas can be subject to secondary sanctions. *Id.*

72. There are many different rounds of review in the designation process, which results in a "very authoritative and highly reliable product." Day 2 Tr. 98:5-7 (Levitt).

73. Since 1987, Hamas has committed a multitude of terrorist attacks ranging from small-scale stabbings to large-scale suicide bombings and rocket and mortar attacks, against both military and civilian targets. Shaked Decl. ¶ 36; Day 2 Tr. 89:11-20 (Levitt).

74. This Court finds that Hamas is a terrorist organization.

**D.      Hamas Committed the Attack**

75. Dr. Shaked and Col. Spitzen, both experienced and qualified experts, credibly testified that

their unequivocal opinion was that Hamas is responsible for the Attack. Day 1 Tr. 67:9-

68:2 (Shaked); Day 1 Tr. 85:18-86:4 (Spitzen).

76. Dr. Shaked used the "Shaked Method of Attribution: Criteria" to reach his conclusion that

Hamas committed the attack. Day 1 Tr. 39:11-40:17 (Shaked). For this method, Dr. Shaked

started by reviewing all of the available media—newspapers, messages, videos, graffiti,

official communications. *Id*. He then looked into the media to see what people have or have

not posted. *Id*.  He checked each organization's platform that they typically use to convey

messages, including group and individual members' social-media pages. *Id*. Dr. Shaked

also reviewed all the court documents and documents of the Israeli governments. *Id*.

77. Col. Spitzen examined four relevant components of the attack to reach his conclusion that

Hamas committed the attack. Day 1 Tr. 90:13-91:24 (Spitzen); Ex. 5 (slide 9). First, he

examined the organization and operation of the cell and concluded that it was organized in

a way typical to that of a Hamas cell. Day 1 Tr. 92:5-104:4 (Spitzen); Day 2 Tr. 7:9-17:1

(Spitzen). Second, Col. Spitzen examined Hamas's public claims of responsibility on

different media outlets. Day 2 Tr. 18:10-33:7 (Spitzen). Third, Col. Spitzen looked to the

conclusion of the Israeli Security Agency ("ISA"), which determined that Hamas

committed the Attack. Finally, Col. Spitzen examined the relevant personal history of each

cell member, including prior arrests and convictions for Hamas membership, and explained

that these histories provided further evidence that Hamas committed the Attack. Day 2 Tr.

36:9-40:15 (Spitzen).

*(1) The Attack*

78. On October 1, 2015, Hamas, a designated FTO, committed the attack that murdered Eitam
Henkin and his wife, Na'ama Henkin, in front of their four minor children. Spitzen Decl.
10; Day 1 Tr. 46:3-9 (Shaked).

79. At the time of the Attack, the children were nine years old (M.H.H.), seven years old
(N.Y.H.), four years old (N.E.H.), and ten months old (I.Z.H.). Day 1 Tr. 46:5-6 (Shaked).

80. Five individuals directly participated in the Attack: (1) Ragheb Ahmad Muhammad Aliwi,
who led the terrorist cell, (2) Yahya Muhammad Naif Abdallah Haj Hamad, (3) Samir
Zuheir Ibrahim Kusa, (4) Karam Lutfi Fathi Rizq al-Masri, and (5) Zayd Zayyad Jamil
Amer. Spitzen Decl. 10.

81. These five individuals were an Izz a-Din al-Qassam Brigades operational terror cell that
reported to a command echelon consisting of senior Hamas operatives, including Bassam
Amin Muhammad a-Sayih, Iyad Wadi Tawfiq Abu Zahra, Amjad Adel Muhammad Aliwi,
and Muhammad Imad Ramadan al-Qutub. *Id.*

82. On the evening of October 1, 2015, Eitam Henkin was driving his family in the West Bank
along Route 555 southward from the direction of Elon Moreh toward Route 60 on their
way home to Neria (approximately a one-hour drive from Elon Moreh)—in the general
vicinity of Nablus. *Id.* at 11; Day 1 Tr. 45:25-46:2 (Shaked).

83. In the opposite direction, Samir Kusa drove a car containing Haj Hamad and Karam Rizq.
Spitzen Decl. 10; Day 1 Tr. 46:10-11 (Shaked). They had previously received the "all
clear" from Amer, who, in another vehicle, scouted the route to ensure that Israeli security
forces were not present. Spitzen Decl. 11; Day 1 Tr. 45:22-46:2 (Shaked).

84. Samir Kusa made a U-turn, sped up, and overtook the Henkins' car. Spitzen Decl. 12; Day 1 Tr. 46:16-17 (Shaked).

85. Haj Hamad leaned out the car's window and sprayed the left side of the Henkins' car with automatic weapons fire from an M16. Spitzen Decl. 12; Day 1 Tr. 45:18-21 (Shaked).

86. Eitam was wounded by the gunfire and forced to pull the car over on to the side of the road. Spitzen Decl. 12.

87. Haj Hamad and Karam Rizq approached the vehicle—Haj Hamad on the passenger side, where Na'ama sat, and Karam Rizq on the driver's side. Spitzen Decl. 12; Day 1 Tr. 47:22-48:4 (Shaked).

88. They attempted to kidnap Eitam and Na'ama, but after Eitam struggled with and disarmed Karam Rizq, Haj Hamad fired a burst from his M16 on fully automatic, killing Eitam, but also hitting Karam Rizq. Spitzen Decl. 12.

89. Na'ama began struggling with Haj Hamad, so he also shot her at close range with a burst of automatic weapons fire. Spitzen Decl. 12; Day 1 Tr. 47:11-14 (Shaked).

90. The four Henkin children were in the back seat of the car for the entire attack. Spitzen Decl. 13; Day 1 Tr. 48:1-4 (Shaked).

91. Karam Rizq was wounded, so he and Haj Hamad retreated from the scene, and Rizq was hospitalized in Nablus. Spitzen Decl. 12.

92. The terror cell paid for Rizq's medical care. *Id.* at 31.

93. Between October 3, 2015, and October 8, 2015, all five terror-cell members were arrested by Israeli security forces. *Id.* at 12.

94. By October 26, 2015, the four members of the command echelon were also arrested by Israeli security forces. *Id.* at 27-33.

95. Eight of the nine terror operatives were convicted by an Israeli military court for their role in the Attack, including for membership in Hamas. Day 2 Tr. 40:5-49:15 (Spitzen); Spitzen Decl. 33-37.

96. The final terror cell member, Zayd Amer, is under indictment, and his trial is still pending the resolution of an ongoing appeal. Day 2 Tr. 48:2-21 (Spitzen).

*(2) The Construction and Operation of the Hamas Terror Cell*

97. This terror attack was carried out in a very organized manner, with long-term preparations and a clear hierarchy structure. Day 1 Tr. 90:13-25 (Spitzen). Col. Spitzen described this terror cell as a "classic example [of] how a Hamas terror cell works." *Id.*

98. The terror cell was created in the second half of 2014 after Amjad Aliwi had meetings with Bassam a-Sayih and Iyad Abu Zahra. Day 1 Tr. 92:23-93:14 (Spitzen); Spitzen Decl. 15.

99. This terror cell had a command echelon of four people, including two of the most senior Hamas commanders in the Nablus area. Day 1 Tr. 92:6-10 (Spitzen). Bassam a-Sayih and Iyad Abu Zahra were the senior members responsible for funding, supplying, recruiting, and authorizing actions of the terror cell. Day 1 Tr. 93:20-25 (Spitzen). Amjad Aliwi was responsible for communicating with the terror cell, and Muhammad al-Qutub was responsible for certain logistics. Day 1 Tr. 94:6-19 (Spitzen).

100.     Bassam a-Sayih was responsible for providing funds to the cell for weapons, ammunition, and medical treatment for Rizq. Day 1 Tr. 93:18-94:5 (Spitzen); Spitzen Decl. 15. Bassam was put in charge of funding because of his access to Hamas coffers, which gave him continuous access to funding, including channeling approximately 200,000 New Israeli Shekels ("NIS") (approximately $50,000 at the time) to the cell. Spitzen Decl. 15.

101.     Iyad Abu Zahra examined the M16 used in the attack and occasionally transferred money to Amjad Aliwi to run the cell. Spitzen Decl. 16.

102.     Ragheb Aliwi was the commander of the operational cell, and he was recruited by Amjad Aliwi, with Iyad Abu Zahra's approval. Day 1 Tr. 94:20-95:6 (Spitzen). He was in charge of recruiting, training, and providing logistics for the cell, which are the classic roles of a cell commander. Day 1 Tr. 95:12-18 (Spitzen); Spitzen Decl. 19.

103.     Ragheb Aliwi directly recruited Yahya Haj Hamad and recruited Samir Kusa to be the getaway driver because of his experience as a taxi driver. Day 1 Tr. 95:9-23 (Spitzen); Spitzen Decl. 34. Those recruitments had to be approved by Amjad Aliwi and the cell's command echelon. Spitzen Decl. 19.

104.     Ragheb Aliwi reported directly to Amjad Aliwi, provided him with updates, and received express permission from him to commit the attack against the Henkins. Spitzen Decl. 19. Ragheb Aliwi was also the middleman between the command echelon to funnel money and weapons and to relay directives to the terror cell. Spitzen Decl. 19.

105.     Yahya Haj Hammad recruited Karam Rizq and Zayd Armer, and these recruitments were also approved both by the cell's commander, Ragheb Aliwi, and by the command echelon. Day 2 Tr. 95:19-96:9 (Spitzen); Spitzen Decl. 19.

106.     The cell also operated like an organized Hamas cell in respect to its funding and detailed preparations. Day 1 Tr. 99:15-22, 102:1-15 (Spitzen); Day 2 Tr. 16:20-17:1 (Spitzen).

107.     The terror cell requested two weapons, an automatic weapon and a handgun, because a handgun was needed for a kidnapping. Day 1 Tr. 100:3-9 (Spitzen). The

command echelon provided funding needed for the weapons: approximately $13,500 for the M16 and $4,500 for the handgun. Day 1 Tr. 100:10-101:2 (Spitzen); Spitzen Decl. 15.

108.      The terror cell also selected its targets in a manner that is classic for Izz a-Din Al-Qassam Brigades—the military wing of Hamas. Day 1 Tr. 103:10-21 (Spitzen). The cell used a hierarchical, military chain of command, where any cell member could propose a target and, after some investigation and deliberation with Ragheb Aliwi, the target would be accepted or rejected. Day 1 Tr. 102:1-15. For example, the cell considered attacking Ein Fara Spring, but rejected that proposal because too many Palestinians were present. Day 1 Tr. 102:16-22 (Spitzen); Spitzen Decl. 20 n.49.

109.      Before the Attack, the terror cell shot at a car near the community of Einav, but the driver was not hit by any bullets or seriously harmed. Day 2 Tr. 7:2-8:7 (Spitzen). As a result of this disappointment, the cell proposed a kidnapping. Day 2 Tr. 8:8-14 (Spitzen).

110.      Because of the priority Hamas places on kidnapping attacks and the complexity of a kidnapping, the cell would have required the approval of the command echelon and likely an operative even more senior, which they received. Day 1 Tr. 99:2-6 (Spitzen); Day 2 Tr. 8:14-9:1 (Spitzen).

111.      The terror cell's short-term preparations were also reflective of a trained, regimented cell, like an Izz a-Din al-Qassam cell. Day 2 Tr. 16:11-13 (Spitzen); Spitzen Decl. 16.

112.      The attackers scouted the location and used a lookout, Zayd Amer, in a second car to confirm the road was clear of Israeli security forces. Day 2 Tr. 15:16-23 (Spitzen); Spitzen Decl. 11. Zayd informed Yahya Haj Hamad by calling Haj Hamad's cell phone and hanging up after only one ring. Day 2 Tr. 15:16-23 (Spitzen).

113.    Otherwise, the attackers had their phones turned off to avoid detection by Israeli security services. Day 2 Tr. 15:16-23 (Spitzen).

114.    The attackers also covered their faces, used gloves to avoid leaving fingerprints, obscured the license plates, brought restraints to secure the abductee, arranged for a doctor to be available should the abductee be injured, planned an escaped route, and reported to their commander using code words. Day 1 Tr. 47:21-25 (Shaked); Day 2 Tr. 15:3-16:24 (Spitzen); Spitzen Decl. 20.

115.    The structure of the terror cell, and the short-term and long-term planning and organization, demonstrate that this was a Hamas terror cell.

*(3) Hamas Claimed Responsibility for the Attack*

116.    On June 23, 2016, Hamas claimed official responsibility for the attack after the four attackers confessed to the murders and were sentenced. Spitzen Decl. 24. Hussam Badran, the official spokesperson of Hamas, announced that the Izz a-Din al-Qassam Brigades carried out the "Itamar Operation" and the attackers are "sons of Hamas." Shaked Decl. ¶ 52; Day 1 Tr. 56:16-22 (Shaked); Day 2 Tr. 20:8-12 (Spitzen); Spitzen Decl. 24.

117.    Badran praised the Attack, and the announcement was published on the Al-Qassam Brigades official website. Shaked Decl. ¶ 52.

118.    The website also shows a picture of the Henkins' car and pictures of the members of the terrorist cell who carried out the Attack. *Id.*

119.    Abu Ubaidah, the Izz a-Din al-Qassam Brigades' official spokesman, previously explained that Hamas will postpone claims of responsibility to protect jailed operatives who have not yet been sentenced, or in other appropriate circumstances. Day 2 Tr. 24:1-

26:21 (Spitzen); Spitzen Decl. 6; Ex. 5 (slide 25). This explains why Hamas did not take official responsibility until June 23, 2016, months after the Attack.

120.     On the official website of Al-Qassam Brigades, the military wing of Hamas, in the section dedicated to "Organization Operations," there is a headline for the page that states, "Itamar Operation." Shaked Decl. ¶ 49.  The announcement gives the following details: **Type of action**: planned ambush; **Place of operation**: near Itamar settlement ("Itamar"); **Date**: 1.10.2015; **Lost to enemy**: two killed Zionist settlers. *Id.* Attached to the announcement are four pictures depicting the scene of the murders of Eitam and Na'ama Henkin. *Id.*

121.     Additionally, on October 1, 2016, the one-year anniversary of the Attack, the official website of the Al-Qassam Brigades published a 50-second-long video entitled "Itamar's Heroic Action," which glorified the Attack, listed the attackers' names, and highlighted the date of the attack. Shaked Decl. ¶ 50. The opening contains the official, iconic emblem of the Al-Qassam Brigades, which continues to appear throughout the video. *Id.*

122.     Similarly on October 1, 2016, the official website of the Al-Qassam Brigades published a detailed statement about the terrorist cell and its operation in Itamar. *Id.* at ¶ 51. The announcement refers to the terrorist cell as "Heroes of Al-Qassam" and mentions Eitam Henkin by name. *Id.*

123.     Again, on October 1, 2017, the official website of the Al-Qassam Brigades published a short film containing a dramatic reenactment of the attack glorifying the attackers. Day 1 Tr. 59:17-60:18 (Shaked); Shaked Decl. ¶ 53. The same video was posted

on the Al-Qassam Brigades official website on October 1, 2018, and again on September 30, 2019. Shaked Decl. ¶ 53; Day 1 Tr. 61:14-62:21 (Shaked).

124.    The video stated, "The attack in Itamar is the spark of the intifada and the power of revenge." Shaked Decl. ¶ 53. The intifada, also referred to as the Al-Quds Intifada, was a wave of terror attacks committed from approximately September 2015 until mid-2016. Day 2 Tr. 29:24-30:21 (Spitzen).

125.    The intifada began under the mistaken premise that Israel was going to change the status quo on the Temple Mount by destroying mosques and building a temple. Day 2 Tr. 29:24-30:21 (Spitzen). The intifada was characterized by a cry to the public to start a popular uprising by using any weapons at their disposal. *Id.*

126.    In addition to directly taking responsibility for the Attack, Hamas also indirectly praised the terrorist attack. Shaked Decl. ¶ 60.

127.    On the same day as the Attack, October 1, 2015, Abu Ubaidah posted on Hamas's official website congratulations to the "Nablus operation"—that is, the Henkin attack— stating that "it will not be the last." Day 2 Tr. 21:14-22:15 (Spitzen).

128.    Shortly after the Attack, Hamas's official website listed the attack under the heading "Harvest of the resistance: two Israelis were killed, and 17 others wounded within a week in the West Bank." Ex. 5 (slide 24); Day 2 Tr. 22:16-23:2 (Spitzen); Spitzen Decl. 22-23. Hamas's use of the term "resistance" is a hint at responsibility, because its official name is the "Islamic Resistance Movement" and, as Col. Spitzen explained, "this is very typical of Hamas and other organizations . . . they use specific terminology that, to the Palestinian ear, makes it understandable who is behind each operation." Day 2 Tr. 23:3-11 (Spitzen); Spitzen Decl. 21-22.

129.      Additionally, on October 7, 2015, after Israel's security forces demolished the houses of the terrorists who committed the murders, the official website of the Al-Qassam Brigades published a report about the demolition and attached photos of the cell members and a picture of the Henkins' car after they were attacked. Shaked Decl. ¶ 60.

130.      That same day, Hamas flags were raised on the demolished houses. The flags were a proud message to city residents that the terrorists belonged to Hamas. *Id.* at ¶ 61.

131.      Another group also claimed responsibility for the Attack, but the Court agrees with Dr. Spitzen's assessment that this claim is unreliable and inaccurate. Day 2 Tr. 31:20-33:3 (Spitzen); Spitzen Decl. 22-23. "One small unknown group which called itself the Abdel Qader al-Husseini Brigades" and identified with Fatah claimed responsibility on a Fatah blog. Day 2 Tr. 32:4-7 (Spitzen); Spitzen Decl. 23 n.61. On October 1, 2015, a member of the Fatah Central Committee quoted from a Palestinian press report attributing the attack to Fatah. Day 2 Tr. 32:4-7 (Spitzen); Spitzen Decl. 23 n.61.

132.      This alternate claim of responsibility quickly dissipated, and Col. Spitzen did not locate any allegations suggesting Fatah had a role in the attack dated later than October 3, 2015. Day 2 Tr. 32:15-17 (Spitzen).

133.      Fatah never officially took responsibility for the attack and never challenged either Hamas's official claim of responsibility or the ISA's finding that Hamas committed the Attack. Day 2 Tr. 32:17-21 (Spitzen).

*(4) The Israeli Security Agency Concluded that Hamas Committed the Attack*

134.      The Israeli Security Agency ("ISA") is an "extremely credible organization" that is "officially in charge of and responsible for preventing terror attacks and defending the

security of the State of Israel." Day 2 Tr. 34:6-12 (Spitzen); Spitzen Decl. 27; Ex. 5 (slide 29); Shaked Decl. ¶ 85.

135.     On October 5, 2015, after the members of the terror cell were arrested and interrogated, the ISA issued a report naming the five members of the operational terror cell, providing a precise description of the Attack, and concluding "unequivocally" that Hamas was responsible for the Attack. Day 2 Tr. 33:11-34:1 (Spitzen); Spitzen Decl. 27; Ex. 5 (slide 29).

136.     Additionally, Col. Spitzen stated that if the ISA discovers that it published an incorrect conclusion, it will correct its mistake; however, the October 5, 2015, report has not been corrected or withdrawn. Day 2 Tr. 34:19-23 (Spitzen); Spitzen Decl. 27.

*(5) The Attackers are Members of Hamas*

137.     During the trials, the terrorists admitted that they are members of the Izz al-Din al-Qassam Brigades, that they were Hamas operatives, and that Hamas committed the attack. Shaked Decl. ¶ 87; Day 2 Tr. 49:8-9 (Spitzen); Spitzen Decl. 27-37.

138.     Bassam a-Sayih was a "very high-ranking Hamas operative in the Nablus area." Day 2 Tr. 38:11-12 (Spitzen). He was active in Hamas since the 1990s and was arrested numerous times in connection with terrorist activity. Day 2 Tr. 38:12-15, 39:15-23 (Spitzen).

139.     Bassam a-Sayih was convicted for his role in the attack—obtaining the funds, weapons, and various authorizations needed for the attack—and for being a Hamas operative since at least 2004. Day 2 Tr. 40:8-11 (Spitzen); Spitzen Decl. 27. He died of cancer in prison before he could be sentenced. Day 2 Tr. 40:8-11 (Spitzen); Spitzen Decl. 29. After his death, Hamas eulogized him as a field commander for the Izz a-Din al-Qassam

Brigades and as a "shahid," i.e., a martyr, who was responsible for the Itamar terror attack against the Henkins. Day 2 Tr. 40:8-41:11 (Spitzen); Ex. 5 (slide 32).

140.    Iyad Abu Zahra served two prior prison sentences for Hamas activity and was previously convicted of Hamas membership. Day 2 Tr. 41:12-16 (Spitzen); Spitzen Decl. 31. After his release from prison, he was visited publicly by Hamas representatives from the Palestinian Legislative Council, which is indicative of how important Iyad was to Hamas. Day 2 Tr. 42:6-10 (Spitzen); Ex. 5 (slide 34). He pleaded guilty for his role in the attack—obtaining weapons, financing the terror cell, and abetting the escape of Rizq, who was wounded during the Attack. Spitzen Decl. 30. He was sentenced to seven years in prison. *Id.*

141.    Amjad Aliwi has been convicted multiple times as a Hamas operative, is listed on the official Hamas website as a Hamas prisoner, and Hamas decorated his house with a Hamas flag when it was demolished after the Attack. Day 2 Tr. 42:19-43:18 (Spitzen); Spitzen Decl. 30-31. He pleaded guilty and was convicted for his role in the Attack, membership in Hamas, and other criminal counts. Spitzen Decl. 32. He was sentenced to two life sentences plus 30 years in prison. *Id.*

142.    Muhammad al Qutub was previously convicted of Hamas membership, and he pleaded guilty and was convicted for his role in the Attack, Hamas membership, and other criminal counts. Spitzen Decl. 33. He was sentenced to 70 months in prison, and the Hamas website describes him as a Hamas prisoner. Day 2 Tr. 43:25-44:4 (Spitzen); Spitzen Decl. 33.

143.    Ragheb Aliwi, the leader of the terror cell, was previously convicted of Hamas membership. Day 2 Tr. 44:6-9 (Spitzen); Spitzen Decl. 34. He used to serve as an armed

security guard for Hamas members of the Palestinian Legislative Council and was an experienced Hamas member when he joined the cell. Day 2 Tr. 44:8-10 (Spitzen); Spitzen Decl. 34. Ragheb was not present at the attack, but he confessed to his role in the terror cell and to Hamas membership, so he was convicted and sentenced to two life sentences plus 30 years. Day 2 Tr. 44:13-22 (Spitzen); Spitzen Decl. 34. At his sentencing, he stated that the Izz a-Din al Qassam Brigades was responsible for the attack. Day 2 Tr. 44:13-22 (Spitzen); Spitzen Decl. 34.

144.        Yahya Haj Hamad fired the weapon that murdered Eitam and Na'ama Henkin, and he confessed to his role in the attack and membership in Hamas since the beginning of 2015. Day 2 Tr. 44:23-45:7 (Spitzen). He was convicted and sentenced to two life sentences plus 30 years. Day 2 Tr. 44:5-7 (Spitzen); Spitzen Decl. 35. At his sentencing, he also stated that the Izz a-Din al Qassam Brigades were responsible for the attack. Day 2 Tr. 45:8-13 (Spitzen); Spitzen Decl. 35.

145.        Samir Kusa drove the terrorists' vehicle during the attack and confessed to his role in the attack and to Hamas membership. Day 2 Tr. 47:5-11 (Spitzen); Spitzen Decl. 36. He was convicted and sentenced to two life sentences plus 30 years. Day 2 Tr. 47:5-11 (Spitzen); Spitzen Decl. 36. He confessed that he knew he was acting on Hamas's behalf to commit a Hamas attack, and the Hamas website lists him as a Hamas prisoner. Day 2 Tr. 47:24-48:1 (Spitzen); Spitzen Decl. 36.

146.        Karam Rizq al-Masri was the second gunman during the attack who was shot accidentally by Haj Hamad. Day 2 Tr. 47:15-18 (Spitzen); Spitzen Decl. 36-37. He confessed to his role in the attack and to Hamas membership, and in court he stated that he regretted nothing and took pride in his actions. Day 2 Tr. 47:15-18 (Spitzen); Spitzen Decl.

36-37. He was convicted and sentenced to two life sentences plus 30 years, and the Hamas website lists him as a Hamas prisoner. Day 2 Tr. 47:24-48:1 (Spitzen); Spitzen Decl. 36-37.

147.     Zayed Amer served as a lookout for the attack and has been indicted for his role in the Attack, but, as of the date of the evidentiary hearing, he has not yet been convicted because certain matters are on appeal. Day 2 Tr. 48:2-13 (Spitzen). He has been remanded to custody until trial and appears on the Hamas website as a Hamas prisoner. Day 2 Tr. 48:17-21 (Spitzen).

148.     Accordingly, the Court finds that based on the direct and indirect statements issued by Hamas, the 2015 ISA report, the expert opinions of Dr. Shaked and Col. Spitzen, and the statements and convictions of the individual attackers, the October 1, 2015, terrorist attack in which Eitam and Na'ama Henkin were murdered was committed by Hamas.

### E.     The Defendants' Material Support for Hamas

*(1) Iran*

149.     Dr. Clawson and Dr. Levitt credibly testified that Iran has provided material support for Hamas—in the form of financing, weapons, and training—for years before, during, and after the period leading to the attack. Day 2 Tr. 55:15-63:8 (Clawson); Clawson Decl. ¶¶ 32-66, Day 2 Tr. 104:16-113:4 (Levitt); Levitt Decl. 24-32.

150.     Iran is a foreign state that has supported Hamas since at least 1984, and though Iran's relationship with Hamas "has wax[ed] and wane[d]," it has never completely stopped. Day 2 Tr. 57:13-15 (Clawson); Clawson Decl. ¶ 30. Dr. Levitt concurred. Day 2 Tr. 105:14-106:10 (Levitt); Levitt Decl. 28-32.

151.      The U.S. Department of State designated Iran as a state sponsor of terror in 1984 for its support for other terrorist groups, and Iran has been so-designated ever since. Clawson Decl. ¶ 22; "State Sponsors of Terrorism," U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/.

152.      The U.S. State Department in its *Country Reports on Terrorism*, and its predecessor report, the *Patterns of Global Terrorism*, has consistently stated from 2007 through 2018 that Iran provides weapons, training, and funding to Hamas, and it recognizes that Hamas has committed attacks in the West Bank. Clawson Decl. ¶ 27.

153.      Iran's self-proclaimed goal is to export revolution, eliminate the American military presence in the Middle East, and to end the existence of the State of Israel, and it will support terrorist organizations to accomplish these goals. Day 2 Tr. 56:2-17 (Clawson).

154.      Based on Iran's self-proclaimed goal and its concomitant support for terror, the Court finds that Iran's degree of integration in Hamas's terror policies is high.

155.      The Court finds that Iran was designated as a state sponsor of terrorism at the time of the attack, and still is so-designated.

          *(a) Funding*

156.      Iran provides significant financial support to Hamas, which has exceeded millions of dollars over the years. Day 2 Tr. 60:6-21 (Clawson); Day 2 Tr. 108:2-6 (Levitt).

157.      Iran utilizes its banking system, especially through Lebanon, to transfer money to Hamas cells in Gaza. Day 2 Tr. 61:20-25 (Clawson).

158.      September 2015 media reports claimed that Iran sent suitcases of cash earlier that summer to Hamas's military wing in Gaza, which Dr. Clawson describes as "a common

method for Iran to provide funds to Hamas." Day 2 Tr. 60:20-61:12 (Clawson); Day 2 Tr. 107:13-108:6 (Levitt).

159.        Additionally, Mahir Jawad Yunis Salah, a Hamas financier who the Treasury Department designated in September 2015 under E.O. 13224, "oversaw the transfer of tens of millions of dollars from Iran, through his office in Saudi Arabia, to fund the Hamas military wing in Gaza." Day 2 Tr. 108:12-109:6 (Levitt); Levitt Decl. 31.

*(b) Weapons*

160.        Iran also provides Hamas with weapons. On March 5, 2014, the Israeli navy intercepted the *Klos-C*, which was a ship smuggling Iranian- and Syrian-made weapons. Day 2 Tr. 109:7-110:21 (Levitt); Levitt Decl. 30-31. The ship was intercepted in the Red Sea *en route* to Sudan, where the weapons would have been taken over land through Egypt and then into Gaza to support Hamas. Day 2 Tr. 109:7-110:21 (Levitt); Levitt Decl. 30-31.

161.        Additionally, on March 4, 2008, then-U.S. Secretary of State Condoleezza Rice said, "it is very clear that Hamas is being armed, and it's very clear they are being armed by the Iranians." Day 2 Tr. 62:9-18 (Clawson); Clawson Decl. ¶ 42.

*(c) Military Training*

162.        Iran also provides military training to Hamas's members. Day 2 Tr. 111:15-113:3 (Levitt); Day 2 Tr. 62:13-63:4.

163.        Dr. Clawson testified that distinguished war correspondent Marie Colvin observed in 2008 that at least 150 members of Hamas's military wing have gone through training in Tehran. Day 2 Tr. 62:19-63:4 (Clawson); Clawson Decl. ¶ 44.

164.        Iran's political support for Hamas declined as a result of the Syrian Civil War, but Iran continued to support Hamas's military branch. Day 2 Tr. 105:14-106:1 (Levitt).

165.     By late 2014, Iran's relationship with Hamas was "pretty fully repaired." Day 2 Tr.

58:10-59:3 (Clawson); Day 2 Tr. 106:2-10 (Levitt). In March 2014, Ali Larijani, head of

the Iranian Shura Council, stated that "Iran is supporting Hamas on the grounds that it is a

resistance movement. Our relationship with Hamas is good and has returned to what it was.

We have no problems with Hamas." Day 2 Tr. 106:13-22 (Levitt); Levitt Decl. 28.

166.     Iran continued to support Hamas after the attack. Levitt Decl. 32; Clawson Decl. ¶

59. In February 2017, Hamas's then-new leader in Gaza, Yehiyeh Sinwar, reported that

Iran is the largest financial and military backer to Hamas's military wing. Clawson Decl. ¶

60.

167.     In addition to the evidence presented in this case, the Court exercises its discretion

to take judicial notice under Federal Rule of Evidence 201(b)(2) of the findings in the

following cases from this Court that Iran provided material support in connection with

Hamas attacks that occurred in the approximate timeframe of the attack against the

Henkins: *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 340 (D.D.C. 2020)

(holding, regarding seven separate Hamas attacks that took place in Israel between March

6, 2008, and March 8, 2016, that "Iran provided material support in the form of arms,

training, funds, and technology to Hamas at least from 2006 to 2016"); *Braun v. Islamic*

*Republic of Iran*, 228 F. Supp. 3d 64, 69 (D.D.C. 2017) (October 22, 2014 Hamas attack);

*Estate of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910, 2019 WL 6117722, at

*2, *4 (D.D.C. Nov. 18, 2019) (Lamberth, J.) (July 14, 2014 Hamas attack).

168.     This Court finds by evidence satisfactory to the court Iran provided material support

to Hamas for years, including the time leading up to and immediately before the attack

against the Henkins.

*(2) The Islamic Revolutionary Guard Corps*

169.     Both Dr. Clawson and Dr. Levitt testified that the Islamic Revolutionary Guard

Corps ("IRGC") provided material support to Hamas in the time leading up to the October

1, 2015, attack. Day 2 Tr. 64:7-12 (Clawson); 114:6-8 (Levitt).

170.     The IRGC is part of the Iranian government, and it is a military organization

referred to in the Iranian Constitution, which operates parallel to the Iranian military. Day

2 Tr. 63:9-19 (Clawson); Clawson Decl. ¶¶ 69-71.

171.     The IRGC reports directly to Iran's Supreme Leader, who is the commander-in-

chief of all of the Iranian military. Day 2 Tr. 63:20-24 (Clawson). The IRGC is "assigned

to protect the revolution from enemies foreign and domestic." Day 2 Tr. 63:9-24

(Clawson).

172.     Additionally, part of the IRGC's mission includes the spread of fundamentalist

Islamist principles throughout the world. Clawson Decl. ¶ 73.

173.     The Qods Force ("IRGC-QF") branch of the IRGC is responsible for "foreign

operations" and, in 2007, the U.S. Department of the Treasury designated IRGC-QF as a

Specially Designated Global Terrorist ("SDGT") under Executive Order 13224. This

designation is still in place today. Press Release, U.S. Dep't of Treasury, "Treasury

Designates the IRGC under Terrorism Authority and Targets IRGC and Military

Supporters     under     Counter-Proliferation     Authority"     (Oct.     13,     2017)

https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx.

174.     The press release accompanying the designation specifically stated that the IRGC-

QF "enables . . . the lethal activities of . . . Hamas." *Id.*

175.     Iranian banks and the IRGC will use the IRGC-QF to pass weapons and funds to

Hamas. Levitt Decl. 32. As Dr. Levitt explained, the IRGC-QF "is a kind of expeditionary

force to carry out its own operations abroad and to liaise with others." Day 2 Tr. 113:10-

17 (Levitt).

176.     In 2017, Congress reaffirmed legislative findings that IRGC-QF "is the primary

arm of the Government of Iran for executing its policy of supporting terrorists."

Additionally, it concluded that the "IRGC-QF provides material assistance, logistical

assistance, training, and financial support to militants and terrorist operatives throughout

the Middle East[.]" Clawson Decl. ¶ 74. Congress also extended these findings to the IRGC

as a whole. *Id.*

177.     Based on the IRGC's involvement and ideological similarities, the Court finds that

the IRGC's degree of integration in Hamas's terror policies is high.

178.     On April 15, 2019, the Secretary of State designated the IRGC, together with the

IRGC-QF, as a Foreign Terrorist Organization, which was the first time the designation of

FTO was applied to part of another government. U.S. Dep't of State, *Country Reports on*

*Terrorism 2019*, https://www.state.gov/reports/country-reports-on-terrorism-2019/. The

fact sheet accompanying the designation specifically stated that "the IRGC continues to

provide financial and other material support, training, technology transfer, advanced

conventional weapons, guidance, or direction to a broad range of terrorist organizations,

including . . . Hamas." U.S. Embassy in Egypt, *Designation of the Islamic Revolutionary*

*Guard Corps*, https://eg.usembassy.gov/designation-of-the-islamic-revolutionary-guard-

corps/ (visited Jun. 9, 2021).

179.     Additionally, the U.S. State Department's *Country Reports on Terrorism* consistently note that the IRGC and the IRGC-QF have provided support to Hamas. Clawson Decl. ¶ 27.

180.     The Court exercises its discretion to take judicial notice, under Federal Rule of Evidence 201(b)(2), of the findings in the following cases from this Court that the IRGC provided material support in connection with Hamas attacks: *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80 (D.D.C. 2017) (holding that the IRGC provided material support to Hamas in connection with a 2003 attack); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 20 (D.D.C. 2016) (same in relation to a 2002 attack); *Salzman v. Islamic Republic of Iran*, No. CV 17-2475 (RDM), 2019 WL 4673761, at *1 (D.D.C. Sept. 25, 2019) (same in relation to a 1997 attack).

181.     This Court finds by evidence satisfactory to the court the IRGC provided material support to Hamas for years, including the time leading up to and immediately before the attack against the Henkins.

182.     The Court also finds that the core functions of the IRGC are predominantly political, rather than commercial.

*(3) The Ministry of Intelligence and Security*

183.     Both Dr. Clawson and Dr. Levitt credibly testified that the Ministry of Intelligence and Security ("MOIS") provided material support to Hamas in the time leading up to the October 1, 2015, attack. Day 2 Tr. 65:9-16 (Clawson); 114:6-8 (Levitt).

184.     MOIS is part of the regular Iranian government. Day 2 Tr. 64:23-24 (Clawson). It is Iran's foreign and domestic intelligence service, and it is one of the principal

organizations that Iran has used to carry out its terrorist-support activities. Day 2 Tr. 64:18-22 (Clawson); Clawson Decl. ¶ 75.

185.      MOIS is a parallel organization to the IRGC and has somewhat similar mandates. Day 2 Tr. 64:25-65:8 (Clawson). "Iran uses multiple agencies to provide support" to Hamas and the IRGC; specifically, the IRGC-QF and MOIS are two of the most important. Day 2 Tr. 113:10-17 (Levitt). They provide funding, weapons, and training to Hamas. Day 2 Tr. 113:10-21 (Levitt).

186.      In February 2012, the U.S. Department of the Treasury designated MOIS as an SDGT pursuant to E.O. 13224.[5] The press release accompanying the designation states that "MOIS provides financial, material, or technological support for, or financial or other services to[,] Hamas, a terrorist group also designated under E.O. 13224." MOIS remains so-designated to this day. *Id.*

187.      In 2002, a journalist reported that both the IRGC and MOIS were running several terrorist training camps in Iran. Day 2 Tr. 113:22-114:5 (Levitt); Levitt Decl. 27. Hassan Salamah, the Hamas commander who orchestrated several suicide bus bombings, was trained at one of those camps in Iran. Levitt Decl. 27.

188.      MOIS also provided financial aid to Hamas. In February 1999, Canadian intelligence reported that Palestinian police uncovered documents showing the transfer of $35 million to Hamas from MOIS to finance terrorist activities against Israel. Levitt Decl. 24.

---

[5] Press Release, Department of Treasury, Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Supports for Terrorism (Feb. 16, 2012) https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx (visited Jun. 9, 2021).

189.     Based on this involvement and ideological similarities, the Court finds that the MOIS's degree of integration in Hamas's terror policies is high.

190.     For a few years, the IRGC was taking over more functions in supporting Hamas, and MOIS was stepping back but, since 2012, MOIS has taken on more responsibilities in supporting Hamas after the IRGC had some serious operational missteps. Day 2 Tr. 65:17-66:3 (Clawson); Clawson Decl. ¶ 78.

191.     In addition to the evidence presented in this case, the Court takes judicial notice under Federal Rule of Evidence 201(b)(2) of the findings in the following cases from this Court that MOIS provided material support in connection with Hamas attacks: *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 334 (D.D.C. 2020) (holding that MOIS and others provided material support to certain Hamas attacks committed from March 6, 2008, to March 8, 2016); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 389, 405 (D.D.C. 2015) (Lamberth, J.) (holding that MOIS and others provided material support to Hamas in relation to a 2001 attack and stating that "[t]his Court has previously concluded that MOIS is the intelligence organization of Iran and is a conduit of Iranian funds to terrorist organizations"); *see also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80 (D.D.C. 2017) (holding that the IRGC and MOIS, and others, provided material support to Hamas in relation to a 2003 attack); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 20 (D.D.C. 2016) (same in relation to a 2002 attack).

192.     This Court finds by evidence satisfactory to the court that the MOIS provided material support to Hamas for years, including the time leading up to and immediately before the attack against the Henkins.

193.     The Court also finds that the core functions of the MOIS are predominantly governmental, rather than commercial.

*(4) Bank Markazi*

    *(a) Bank Markazi's Ownership*

194.     Bank Markazi (the Central Bank of Iran or "CBI") is the central bank of Iran. Day 2 Tr. 66:13-21 (Clawson); Clawson Decl. ¶ 84. It is the principal regulator of other banks, it issues currency, and it aids the functions of other branches of the Iranian government. Day 2 Tr. 66:13-21 (Clawson). All government revenue is supposed to be channeled into Bank Markazi, and the bank raises funding when the government needs to borrow money. *Id.*

195.     The 1972 Monetary and Banking Law ("MBL"), in theory, governs Bank Markazi's operations; for example, by setting up governance structures and regulating monetary policies. Day 2 Tr. 67:14-68:2 (Clawson). But in practice, the law is not usually followed, and Bank Markazi does not have the independence from the Iranian government that a typical central bank would have. Day 2 Tr. 66:13-67:9 (Clawson).

196.     Within Iran, many have complained about Bank Markazi's lack of independence from the Iranian government. Clawson Decl. ¶ 101.

197.     Dr. Clawson credibly described many examples of how Bank Markazi does not operate as a legally independent bank. Under the MBL, Bank Markazi should be a joint stock company with shareholders who participate in the bank's governance through a "General Meeting," but the Iranian government holds all the stock. Clawson Decl. ¶ 87; Day 2 Tr. 67:11-13 (Clawson).

198.     Additionally, the procedures for how those shares are supposed to be voted on at
the General Meeting are lacking, and there is confusion as to who is supposed to attend the
General Meeting. Day 2 Tr. 68:6-11 (Clawson). Currently the only attendees at the meeting
are the bank's governor and members of the President of Iran's cabinet, also known as
Council Ministers. Clawson Decl. ¶ 88.

199.     Furthermore, all of the profits of Bank Markazi accrue to the government. Day 2
Tr. 68:6-11 (Clawson).

200.     The bank's officers are supposed to be elected by the General Meeting, but several
presidents of Iran have dismissed the governor without paying any attention to the MBL.
Day 2 Tr. 68:12-19 (Clawson). For example, in August 2007, Bank Markazi's Governor,
Ebrahim Sheybani, resigned under strong pressure from then-President Mahmoud
Ahmadinejad. Clawson Decl. ¶ 95. His successor, Tahmasb Mazaheri, was asked to resign
after refusing to issue certain loans. *Id.* After the refusal, President Ahmadinejad replaced
him, violating the MBL's fixed five-year term. *Id.*

201.     A Currency and Credit Council consisting of Bank Markazi's Governor, various
government officials, independent businessmen, and experts appointed by the Economics
and Finance Minister is supposed to establish and approve Bank Markazi's policies, but it
has not met for at least two years. Day 2 Tr. 68:20-69:2 (Clawson); Clawson Decl. ¶¶ 91-
92. The Currency and Credit Council's job has been usurped by the Iranian government,
and the Council of Ministers regularly tells Bank Markazi what to do. Day 2 Tr. 68:20-
69:2 (Clawson); Clawson Decl. ¶¶ 91-92.

202.     As to Dr. Clawson credibly testified, former President Ahmadinejad would proudly
proclaim that the Iranian government has influence over the Bank's decisions to extend

loans, including projects which "were utterly uneconomical and which put the banking system at serious risk." Day 2 Tr. 69:3-13 (Clawson).

203.     The Currency and Credit Council is also tasked with setting the interest rate policy but, in practice, the Iranian president will make announcements ordering the bank to set the rates at certain levels. Day 2 Tr. 71:16-22 (Clawson).

204.     Under former president Ahmadinejad, the interest rates "typically were well below regular inflation, which is economically destructive, as well as destructive to the banks[,] because that means anybody that gets a loan can dramatically profit; they just buy something and sit on it for a while and sell it at a higher price." Day 2 Tr. 71:5-14 (Clawson); Clawson Decl. ¶ 99.

205.     Current President Rouhani, as opposed to the Currency and Credit Council, directed the implementation of restrictive monetary policies, which eventually drove Iran into a recession. Clawson Decl. ¶ 100.

206.     In addition to the evidence presented in this case, the Court exercises its discretion to take judicial notice under Federal Rule of Evidence 201(b)(2) of the factual findings in the following cases holding that Bank Markazi is an agency or instrumentality of Iran: *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011) ("[T]he Central Bank of the Islamic Republic of Iran [is an] agenc[y] and instrumentalit[y] of the state of Iran. [It] has a legal corporate existence outside the government and core functions which are commercial, not governmental, in nature. [It] is, however, tightly connected to the government of Iran, and [it] is an organ of the government and/or has been owned, directed, and controlled by the Iranian state."); *Peterson v. Islamic Republic of Iran*, No. 10 CIV. 4518 KBF, 2013 WL 1155576, at *26 (S.D.N.Y. Mar. 13, 2013) (holding

that Bank Markazi does not engage in ordinary central banking activities), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016)).

207.    In sum, this Court finds that Bank Markazi is majority-owned and controlled by the Iranian government.

208.    The Court also finds that Bank Markazi's core functions are predominantly commercial, rather than governmental.

 *(b) Bank Markazi's Support for Hamas*

209.    Dr. Clawson and Dr. Levitt both testified that Bank Markazi provided material support to Hamas in the time leading up to the October 1, 2015 attack. Day 2 Tr. 64:7-12 (Clawson); 114:10-115:4 (Levitt).

210.    Dr. Clawson's expert opinion is that because Bank Markazi operates as the Iranian government's banker, Iran could not have transferred millions of dollars to a foreign terrorist group without the funds passing through Bank Markazi and without Bank Markazi's knowledge and support. Clawson Decl. ¶ 103.

211.    However, Bank Markazi does not have branches overseas, so it must work with other banks to transfer money overseas. Day 2 Tr. 71:23-72:8 (Clawson).

212.    A press release from the U.S. Treasury Department designating Bank Saderat stated that from 2001 to 2006, Bank Saderat transferred $50 million from Bank Markazi, through its subsidiary in London, to its branch in Beirut for the benefit of Hezbollah. Day 2 Tr. 72:4-23 (Clawson); Clawson Decl. ¶ 104.

213.    Hezbollah has also used Bank Saderat to send money, including millions of dollars, to Hamas. Day 2 Tr. 72:4-23 (Clawson).

214.      Additionally, a State Department cable from March 2008 discussed how Bank
Markazi (and Bank Melli) provided crucial banking services to the Qods Force. Clawson
Decl. ¶ 105.

215.      On June 22, 2010, the U.S. Financial Crimes Enforcement Network ("FinCEN")
released an advisory stating, "the Department of the Treasury is particularly concerned that
the Central Bank of Iran may be facilitating transactions for sanctioned banks." Clawson
Decl. ¶ 112; Day 2 Tr. 72:24-73:7 (Clawson). The advisory also notes that Bank Markazi
has requested that its name be removed from global transactions to make it more difficult
to identify its involvement in the transaction. Clawson Decl. ¶ 112.

216.      On November 21, 2011, the U.S. Treasury Department identified "Iran as a
jurisdiction of primary money laundering concern under Section 311 of the USA
PATRIOT Act based on Iran's support for terrorism" and "the illicit and deceptive financial
activities    that    Iranian    financial    institutions—including    the    Central    Bank    of
Iran— . . . engage in to facilitate Iran's illicit conduct and evade sanctions." Clawson Decl.
¶ 114.

217.      Moreover, in 2012, Congress passed a series of provisions in the National Defense
Authorization Act regarding Bank Markazi that stated, "in mid-2011, the CBI transferred
several billion dollars to designated banks, including Saderat, Mellat, Export Development
Bank of Iran ("EDBI") and Melli, through a variety of payment schemes. In making these
transfers, the CBI attempted to evade sanctions." Clawson Decl. ¶ 115 (quoting P.L. 112–
81, 125 Stat. 1298, 1647, at § 1245).

218.      In the same Congressional report, Congress stated that Iran was designated as a
primary money-laundering concern because "the financial sector of Iran, including the

Central Bank of Iran, is designated . . . because of the threat to the government and financial institutions resulting from the illicit activities of the Government of Iran, including . . . support for international terrorism." *Id.*

219.    As Dr. Levitt credibly explained, Iran "uses an all-elements-of-national-power approach to achieve its foreign policy objectives; and it sees the destruction of Israel, the support of groups like Hamas, as one of those objectives." Day 2 Tr. 115:17-23 (Levitt). To accomplish this, Iran will use multiple banks so that it has a fail-safe as opposed to "put[ting] all of [their] eggs in one basket." Day 2 Tr. 115:8-16 (Levitt). With Iran sending money through multiple media, including suitcases of cash, "money starts in a bank somewhere and, if nothing else, in the central bank of Iran, Bank Markazi." Day 2 Tr. 114:23-115:4 (Levitt).

220.    On September 20, 2019, the U.S. Treasury Department designated Bank Markazi under E.O. 13224 about international terrorism. The press release accompanying that designation stated that "OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF [which] has provided material support to numerous terrorist groups, including ... Hamas[.]" Levitt Decl. 32-33.

221.    Dr. Levitt credibly explained that the designation "is a continuum." Day 2 Tr. 125:24-126:13 (Levitt). The Treasury Department designated Bank Markazi for supporting the IRGC-QF, which itself was designated under E.O. 13224 for its terror activities, back on October 25, 2007, including supporting Hamas. Day 2 Tr. 125:24-126:13 (Levitt). The press release for Bank Markazi's designation further states that "since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI [Bank

Markazi]" and that "we are putting governments on notice that they are risking the integrity of their financial system by continuing to work with the Iranian regime's arm of terror finance, its Central Bank." Clawson Decl. ¶ 123.

222.     Bank Markazi was not designated until 2019, but both Dr. Clawson and Dr. Levitt credibly testified that Bank Markazi was working with other banks to provide support to Hamas and other terrorist organizations prior to 2019. Day 2 Tr. 74:15-75:17 (Clawson); 126:18-22 (Levitt). Dr. Levitt explained that a designation looks backward at past activities. Day 2 Tr. 126:23-25 (Levitt).

223.     The 2007 designation of Bank Saderat mentioned that Bank Markazi had transferred $50 million to Bank Saderat on behalf of terrorist groups. Day 2 Tr. 75:1-9 (Clawson).

224.     Additionally, there was a long debate about the designation of Bank Markazi because the Treasury Department was hesitant to designate a central bank. Day 2 Tr. 73:10-75:17 (Clawson).

225.     Dr. Clawson credibly explained that the U.S. Government originally only designated Iran for its proliferation activities, so the listing could be removed in the event of a nuclear deal, which ended up happening. Once the U.S. withdrew from the nuclear deal, the Treasury department designated Bank Markazi for its support for terrorism. Day 2 Tr. 73:22-74:8.

226.     Dr. Levitt also credibly explained that the U.S. had to consider the unintended economic consequences when deciding on a designation, including effects on the international oil economy, domestic effects on Iran such as starvation, and other pure

economic concerns in addition to the terrorism and national security components. Day 2 Tr. 127:12-25 (Levitt).

227.     With Bank Markazi, as with Bank Melli and Bank Saderat, the U.S. increased sanctions on Iran over time and eventually made the decision to designate Bank Markazi for supporting terrorism. Day 2 Tr. 128:5-11 (Levitt).

228.     Overall, this Court finds by evidence satisfactory to the court that Bank Markazi provided material support to Hamas—in the form of financing—in the years leading up to the October 1, 2015, attack.

229.     As a result of this significant financial support, the Court also finds that Bank Markazi's degree of integration in Hamas's terror policies is high.

 *(5) Bank Melli*

   *(a) Bank Melli's Ownership*

230.     Bank Melli's name means "National Bank of Iran," and it is Iran's oldest and largest commercial bank. Clawson Decl. ¶¶ 125–26.

231.     Bank Melli was founded in 1928, and it was, in effect, Iran's first central bank until 1959, shortly before Bank Markazi (Iran's current central bank) was established. Clawson Decl. ¶ 126.

232.     Bank Melli is "an entirely government-owned commercial bank," and it is the "largest commercial bank in Iran." Day 2 Tr. 75:18-22 (Clawson).

233.     Bank Markazi lists Bank Melli as a "commercial government owned bank." *Id.* at ¶ 132.

234.     Bank Melli provides more banking services to the Iranian government than other commercial banks. Day 2 Tr. 75:18-22 (Clawson). This is in part because the Central Bank

(Markazi) has limits on how much money it can lend to the government, so it will lend money to Bank Melli which, in turn, will lend it to the government, so technically the banks are following the laws. Day 2 Tr. 76:2-9 (Clawson).

235.    Bank Melli's website states that it has "a greater volume of the foreign exchange operations, government banking services and a sizeable share of project and trade financing . . . making it the largest provider of finance for the country's 5-year development plans." Clawson Decl. ¶ 126.

236.    Bank Melli is very active in international transactions and has an active presence overseas. Clawson Decl. ¶¶ 127-28. It has 20 units (branches and subsidiaries) in foreign countries, including England, Germany, France, Russia, the United Arab Emirates, Hong Kong, Afghanistan, Azerbaijan, Oman, Iraq, and Bahrain. *Id.* at ¶ 128.

237.    Because Bank Melli is the country's largest bank, it is particularly subject to orders from the government relating to the allocation of lending, which has limited its ability to make a profit similar to what would be expected from such a large bank. Clawson Decl. ¶ 130.

238.    Bank Melli's most recently published annual report is its 2014–15 report, which states that "the capital of Bank Melli Iran at the end of the fiscal year 2014–15 equaled to IRR 99,065,600 million . . . all of which belong to the Government of the Islamic Republic of Iran." Day 2 Tr. 77:4-11 (Clawson); Clawson Decl. ¶¶ 129, 131.

239.    Dr. Clawson testified that "banks have stopped reporting their results in Iran because they don't want to acknowledge just how dreadful the results would be if they were to follow what is supposed to be the guidelines in Iran"; therefore, the most recent publication is the 2014–2015 annual report. Day 2 Tr. 77:21-25 (Clawson). Currently under

"Financial Reports" on Bank Melli's website, the site says, "this page is under construction." Day 2 Tr. 77:1-4 (Clawson).

240.      The Iranian government also directs Bank Melli to extend credit. Day 2 Tr. 77:12-14 (Clawson).

241.      In addition to the evidence presented in this case, the Court exercises its discretion to take judicial notice under Federal Rule of Evidence 201(b)(2) of the factual findings in the following cases holding that Bank Melli is an agency or instrumentality of Iran: *Shoham v. Islamic Republic of Iran*, 922 F. Supp. 2d 44, 49 (D.D.C. 2013) (Lamberth, J.) (holding that Bank Melli and Bank Saderat are agencies or instrumentalities of Iran in the context of service of process); *see also Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 957 (9th Cir. 2016) ("It is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA."), *abrogated on unrelated grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 419 (S.D.N.Y. 2013) (holding, based on the testimony of Patrick Clawson, that Bank Melli is an instrumentality of Iran under 28 U.S.C. § 1603(b)); *Weinstein v. The Islamic Republic of Iran*, 624 F. Supp. 2d 272, 274 (E.D.N.Y. 2009) ("Melli concedes that the Property is a 'blocked asset' under the [Terrorism Risk Insurance Act] and that Bank Melli is an 'agency or instrumentality' of Iran.").

242.      Overall, the Court finds that the Iranian government owns and controls the majority of Bank Melli.

243.      The Court also finds that Bank Melli's core functions are predominantly commercial, rather than governmental.

*(b) Bank Melli's Support for Hamas*

244.    In 2018, the U.S. Treasury Department designated Bank Melli pursuant to E.O. 13224 "for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF," announcing that "[a]s of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF-controlled accounts at Bank Melli," "Bank Melli has acted as a conduit for payments to the IRGC-QF," and "[t]he IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups." Clawson Decl. ¶ 138.

245.    The same announcement from the Treasury Department stated that "[s]ince the mid-2000s, Bank Melli has increasingly provided services to Iranian Military-related entities as they became further involved in all aspects of the Iranian economy." *Id.* at ¶ 139.

246.    Bank Melli was first designated on October 25, 2007, under E.O. 13382, which relates to Weapons of Mass Destruction (WMD) proliferation activities. Clawson Decl. ¶¶ 134-135; Levitt Decl. 33. In a press release on that same day, the Treasury Department discussed how Bank Melli provides banking services to the IRGC and the Qods Force and how, from 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Clawson Decl. ¶ 134.

247.    That press release also discussed how Bank Melli would employ "deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions." *Id.*

248.    A State Department cable from March 2008 further discussed how Bank Melli (and Bank Markazi) provide crucial banking services to the IRGC-QF, which leads Iranian

support for Hamas. Additionally, entities owned or controlled by the IRGC or IRGC-QF use Bank Melli "for a variety of financial services." *Id.* at ¶ 136.

249.    Dr. Levitt credibly explained this designation as an "A-B-C continuum [where] Bank Melli provides significant funding to the IRGC and the Qods Force. The Qods Force is designated under a terrorism authority because the Qods Force is supporting Hamas and other groups." Day 2 Tr. 123:16-21 (Levitt).

250.    Dr. Clawson and Dr. Levitt both explained why the Treasury Department first designated Bank Melli under E.O. 13382 for WMD proliferation, and not E.O. 13224 for terrorism. Day 2 Tr. 78:1-8 (Clawson); Clawson Decl. ¶¶ 137-38; Day 2 Tr. 121:1-122:3 (Levitt).

251.    Dr. Levitt first discussed how a proliferation designation was more likely to build diplomatic support for sanctions programs in the international community, particularly in Europe. Day 2 Tr. 121:1-3 (Levitt). European governments are more motivated by WMD issues than they are by issues of terror groups fighting against Israel. Day 2 Tr. 121:3-20 (Levitt).

252.    Dr. Levitt explained that the designation of Bank Saderat was different because the Treasury was able to show that the Saderat branch in London was involved in sending money to terrorist organizations, "so there was a unique European hook" that allowed the Treasury Department to use the terrorism designation. Day 2 Tr. 121:20-25 (Levitt).

253.    Dr. Clawson similarly discussed how this WMD designation was an attempt to persuade other countries to get on board with the sanctions. Clawson Decl. ¶ 137. Also, many European governments were reluctant to designate another country's military as a terrorist organization. *Id.*

254.     As a result, the Joint Comprehensive Plan of Action (JCPOA), also known as the

"Iran nuclear deal," lead to the most restrictive designations on Bank Melli to be lifted. *Id.*

However, after the United States withdrew from the JCPOA, the Treasury Department

designated Bank Melli for its support for terrorism under E.O. 13224. Day 2 Tr. 78:1-8

(Clawson).

255.     Bank Melli has also provided banking services to the Imam Khomeini Relief

Committee (IKRC); specifically, services allowing it to transfer money to Hamas and other

terrorist organizations. Clawson Decl. ¶ 140.

256.     The IKRC transferred various humanitarian aid to Gaza, and one of the "packages"

was transferred during June of 2015. *Id.* at ¶ 143.

257.     This Court finds that the 2018 designation does not mean that Bank Melli only

began supporting terrorism in 2018.

258.     In sum, this Court finds by evidence satisfactory to the Court that Bank Melli

provided material support to Hamas—in the form of financing—in the years leading up to

the October 1, 2015, attack.

259.     As a result of this significant financial support, the Court also finds that Bank

Melli's degree of integration in Hamas's terror policies is high.

*(6) Bank Saderat*

*(a) Bank Saderat's Ownership*

260.     Bank Saderat is a commercial bank that, as of 2013, had approximately 3,200

branches worldwide, and a capital of IRR 57800 billion (USD 4.7 billion). Day 2 Tr. 83:11;

Clawson Decl. ¶ 149.

261.     Dr. Clawson described how Saderat was "privatized" in the years after 2007, but this privatization left the government with "great control over the entities concerned." Day 2 Tr. 66:4-66:12, 79:9-82:8 (Clawson); Clawson Decl. ¶¶ 147-162.

262.     The most recent annual report available for Bank Saderat is 2013-2014, and it discloses that the Iranian government owns 22.7% of Bank Saderat's shares, and 40% of Bank Saderat's shares are owned by "Provincial Investment Companies." Day 2 Tr. 9:17-80:1 (Clawson); Clawson Decl. ¶ 149.

263.     The 40% owned by Provincial Investment Companies are considered "justice shares" and were "set up as part of the so-called privatization of Bank Saderat, and they are to hold the shares on behalf of the poor and on behalf of the workers of Bank Saderat. But no individual has those shares, they're in the hands of the succession companies." Day 2 Tr. 80:2-7 (Clawson); Clawson Decl. ¶ 151.

264.     Each province technically has its own investment company, but the finance ministry completely controls them. Day 2 Tr. 80:8-12 (Clawson). These shares are not controlled by these Provincial Investment Companies; they are held by the Privatization Organization (IPO). Clawson Decl. ¶ 153.

265.     The IPO is a government entity that is 100% state-owned. Clawson Decl. ¶ 154. On April 26, 2016, the counselor to the head of the IPO described plans to transfer the justice shares to the beneficiaries by March 21, 2017, but he made it clear that the IPO currently still held the shares. *Id.* at ¶153.

266.     The website of the Justice Shares Information Center confirms that they continue to own 40% of Bank Saderat, which shows that the shares still have not been distributed. *Id.* at ¶158.

267.     In April 2020, Supreme Leader Khamenei said that "we ought to start distributing these things" but nothing has happened since that statement. Day 2 Tr. 80:21-81:1 (Clawson).

268.     The fear in distributing these shares is that the beneficiaries will turn around and sell the shares, which could drive the prices down. Day 2 Tr. 80:14-22 (Clawson).

269.     As a result, 22.7% of Bank Saderat's shares are directly owned by the government, and the 40% that are "justice shares" are directly controlled by the government, leaving the Iranian government with control over at least 62.7% of Bank Saderat's shares. Day 2 Tr. 81:8-18 (Clawson).

270.     Dr. Clawson also credibly explained that more shares are likely held by the government, because 5% of shares are held by the pension plan. Here, the management committee has complete discretion over the pension plan, and the management committee is entirely government appointed. Day 2 Tr. 81:10-18 (Clawson).

271.     The Iranian government also appoints the bank managers and "decides their structures and makes all the other key decisions they must respect" with regard to Bank Saderat. Day 2 Tr. 81:19-82:8 (Clawson); Clawson Decl. ¶ 148.

272.     In addition to the evidence presented in this case, the Court exercises its discretion to take judicial notice under Federal Rule of Evidence 201(b)(2) of the factual findings in its prior decision, *Shoham v. Islamic Republic of Iran*, 922 F. Supp. 2d 44, 49 (D.D.C. 2013) (Lamberth, J.), holding that Bank Saderat is an agency or instrumentality of Iran in the context of service of process.

273.     Overall, the Court finds that the Iranian government owns and controls the majority of Bank Saderat.

274.     The Court also finds that Bank Saderat's functions are predominantly commercial, rather than governmental.

   *(b) Bank Saderat's Support for Hamas*

275.     Dr. Clawson and Dr. Levitt credibly testified that Bank Saderat provided material support to Hamas in the time leading up to the October 1, 2015 attack. Day 2 Tr. 66:9-66:12, 82:9-83:18 (Clawson); Clawson Decl. ¶¶ 163-166; Day 2 Tr. 114:10-15, 115:24-120:8 (Levitt); Levitt Decl. 33.

276.     The U.S. government has made strides to tighten restrictions on Bank Saderat, and in a September 8, 2006 press release, the Treasury Department stated, "[T]he bank is used by the Government of Iran to transfer money to terrorist organizations, including . . . Hamas." Clawson Decl. ¶ 163.

277.     In the same 2006 press release, the Treasury Department announced that Bank Saderat was no longer able to participate in any transfers involving U.S. banks, including U-turn transactions. *Id.* Iran does not have access to the U.S. financial system, but U-turn transactions created a legal exception allowing "Iran to dollarize transactions for the international oil economy through a third-party non-Iranian non-American bank." Day 2 Tr. 116:26-117:10 (Levitt); Levitt Decl. 33; Clawson Decl. ¶ 163. The United States created this exception to make sure the international oil economy remained dollarized and to punish the Iranian government without punishing the entire Iranian population. Day 2 Tr. 116:16-23 (Levitt).

278.     Bank Saderat's behavior did not change, so in 2007, the Treasury Department designated Bank Saderat under Executive Order 13224, the counterterrorism executive order. Day 2 Tr. 118:1-12 (Levitt). The Treasury Department noted that in as early as 2005,

Hamas had substantial assets deposited in Bank Saderat and that, in 2006, Bank Saderat had transferred several million dollars to Hamas. Levitt Decl. 33. Hezbollah has also used Bank Saderat to send money to support Hamas activities, "including millions of dollars on occasion." *Id.*

279.　　In October 2007, the Treasury Department designated Bank Saderat specifically for its support for terror financing, and it is still designated today for its support of Hamas and other terrorist organizations. Day 2 Tr. 118:13-17, 120:6-8 (Levitt).

280.　　Dr. Clawson also testified that Bank Saderat's support for Hamas has likely continued beyond 2013. Day 2 Tr. 83:14-18 (Clawson).

281.　　Additionally, a November 2013 joint report of the European Commission and the U.S. Treasury explained that Bank Saderat has been used by the Government of Iran to channel funds to Hamas. Day 2 Tr. 83:8-15 (Clawson); Clawson Decl. ¶ 165.

282.　　Overall, the Court finds by evidence satisfactory to the Court that Bank Saderat provided material support to Hamas—in the form of financing—in the years leading up to the October 1, 2015 attack.

283.　　As a result of this significant financial support, the Court also finds that Bank Saderat's degree of integration in Hamas's terror policies is high.

　　*(7) Syria*

284.　　Dr. Levitt credibly testified that Syria, a foreign state, has provided Hamas with support in the form of a safe haven for years before the Attack, which facilitated Hamas's fundraising, arms smuggling, and training. Even though Syria's support for Hamas largely ceased in 2012 during the Civil War, Syria's decades of support enabled Hamas to be the

kind of sophisticated terror organization needed to carry out the attack on the Henkins. Day 2 Tr. 98:20-104:15 (Levitt).

285. In 1979, the United States Secretary of State designated Syria as a state sponsor of terror because of its support for Hamas and other terrorist groups, and Syria still remains listed as a state sponsor of terror. Levitt Decl. 34 (citing "State Sponsors of Terrorism," U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/).

286. Since at least as early as 2000 and as recently as 2011, the U.S. State Department's *Patterns on Global Terrorism* report, now called the *Country Reports on Terrorism*, has recognized Syria's support for Hamas. Levitt Decl. 34; U.S. Dep't of State, *Country Reports on Terrorism 2011*, https://2009-2017.state.gov/j/ct/rls/crt/2011/195547.htm.

287. Additionally, in the 2000 *Patterns on Global Terrorism* report, the State Department recognized that "the Syrian Government allowed Hamas to open a new main office in Damascus." Levitt Decl. 34 (citing "Overview of State-Sponsored Terrorism, Patterns of Global Terrorism: 2000," U.S. Department of State, accessed July 25, 2019, https://2009-2017.state.gov/j/ct/rls/crt/2000/2441.htm.).

288. In 2003, Congress passed the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, which specifically found that Syria was supporting terrorists by allowing Hamas to maintain offices, training camps, and other facilities in Syria and to receive supplies from Iran through Syria. Levitt Decl. 34-35.

289. Syria served as Hamas's safe haven that enabled Hamas operatives to plan and facilitate terrorist acts without having to "look over [their] shoulder, [which] is really important for terrorists." Day 2 Tr. 101:3-7 (Levitt).

290.     In 1999, Hamas leaders were kicked out of Jordan and moved to Damascus, where the Hamas headquarters was based openly until the Syrian Civil War. Day 2 Tr. 99:21-100:7 (Levitt).

291.     The State Department's 2006 *Country Reports* found that Hamas kept a group of leaders in Syria to conduct diplomatic fundraising and arms smuggling and, in 2009, the report noted multiple meetings between Hamas leaders and the Syrian government, including President Bashar al-Assad. Day 2 Tr. 100:8-101:18 (Levitt).

292.     Several senior Hamas leaders were using the safe haven of the Damascus headquarters to finance, plan, and oversee attacks in the Gaza Strip, West Bank, and Israel. Day 2 Tr. 100:14-18 (Levitt). Khalid Mishal, Mousa Abu Marzouk, and Imad al-Alami were all U.S.-designated terrorists and Hamas leaders who oversaw large-scale bombings and assassinations from the Damascus headquarters. Day 2 Tr. 101:19-102:13 (Levitt).

293.     Additionally, some of these leaders, such as Imad al-Alami, were collecting funds from abroad in personal accounts and funneling that money from Syria to Hamas in the West Bank and Gaza Strip. Day 2 Tr. 101:19–103:14 (Levitt).

294.     Further, the Israeli foreign ministry issued a 2002 report finding that in the second half of 2001 alone, "more than 20 Hamas operatives were arrested after being spotted and recruited by Hamas members outside of the Hamas headquarters in Damascus." Day 2 Tr. 103:15-24 (Levitt). These Hamas operatives were mostly recruited from Arab universities and sent to Syria for terrorist training—including training in kidnapping, explosives, and other tactics—before being sent ultimately to the West Bank or Gaza to carry out attacks. Day 2 Tr. 103:25-104:15 (Levitt).

295.     In the early 2000s, many of the deadliest Hamas attacks were linked to Damascus. Levitt Decl. 41.

296.     For years, funding for Hamas operations flowed out of the headquarters in Damascus and, in July 2011, Israeli officials arrested Ayman al-Adam, a Hamas operative who delivered money from Syria to a Hamas cell in the West Bank. Levitt Decl. 41.

297.     The Syrian government has also publicly expressed support for Hamas. In a 2002 article in the newspaper *Al Majd*, the Syrian President Assad said that he did not want to suppress demonstrations in Syria, expressing support for the Intifada. Levitt Decl. 35. Similarly, that same year, the then-Vice President of Syria told Radio Tehran that Syria has "given everything to the Intifada." *Id.* In 2008, Syria's Minister of Expatriates stated that Syria would not abandon Hamas, despite a possible Israeli-Syrian détente. *Id.* at 35–36.

298.     Syria's support for Hamas essentially ceased in 2012 due to the Syrian Civil War, although Dr. Levitt testified that "some examples of Syrian support for Hamas continued after that." Day 2 Tr. 99:4-7 (Levitt).

299.     Hamas ultimately broke ties with Syria in 2012 because the Syrian President Bashar al-Assad, who is Alawite, engaged in a sectarian civil war against Syrian civilians, who are majority Sunni, and Hamas is a Sunni organization. Day 2 Tr. 57:16-58:25 (Clawson); 104:23-105:13 (Levitt).

300.     Syria's decades of support contributed to Hamas's ability to carry out the Attack. Dr. Levitt explained that "Hamas would not have been the organization it was on October 1, 2015, with the capability, the intelligence, the training, the skill set, the funding—the organization to carry out an attack like this one were it not for the decades long state sponsorship it enjoyed from Syria." Day 2 Tr. 99:8-19 (Levitt).

301.    Based on material and public support that Syria has given to Hamas, the Court finds

that Syria's degree of integration in Hamas's terror policies is high.

302.    In addition to the evidence presented in this case, the Court exercises its discretion

to take judicial notice under Federal Rule of Evidence 201(b)(2) of the findings in the

following cases from this Court that Syria provided material support in connection with

Hamas attacks that occurred after 2012: *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d

323, 367–68 (D.D.C. 2020) (holding that Syria provided material support to Hamas in

connection with seven separate terrorist attacks that took place in Israel between March 6,

2008, and March 8, 2016); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71–72

(D.D.C. 2017), (October 22, 2014 Hamas attack); *Estate of Steinberg v. Islamic Republic

of Iran*, No. 17-CV-1910, 2019 WL 6117722, at *2, *4 (D.D.C. Nov. 18, 2019) (Lamberth,

J.) (July 14, 2014, Hamas attack).

303.    This Court finds by evidence satisfactory to the Court that Syria provided material

support to Hamas for years, including the time leading up to and before the attack against

the Henkins.

**F.    The Henkin Family Plaintiffs Have Each Suffered Severe Emotional Injury**

*304.*    Additionally, in Case 1184, the Court received a declaration from Dr. Strous which

discussed the emotional injury of Eitam, Na'ama, and the four children. The Court agrees

that Dr. Strous's methods are reliable, that he is a qualified expert in his field, and that his

declaration is relevant to the issues in this case. Accordingly, the Court will admit his

declaration under Federal Rule of Evidence 702.[6]

---

[6] The Court qualifies Dr. Strous as an expert for the purposes of assessing the emotional injuries of the Henkin
family because Dr. Strous's specialized knowledge would help the trier of fact understand that evidence and
determine facts in issue, Dr. Strous's declaration is based on sufficient facts or data, is the product of reliable

*305.*     *Eitam Henkin*

306.     Dr. Strous prepared a psychiatric diagnostic report on Eitam Henkin.

307.     Dr. Strous concluded that as a result of being shot, fearing for his wife and children's safety, and ultimately being shot again, Eitam likely endured "extreme emotional distress, pain, and suffering in the final moments of his life prior to his untimely death." Ex. 6 at Ex. D. at 7-8.

308.     The Court finds that Eitam suffered severe emotional injury and physical injuries that culminated in his death.

*(1) Na'ama Henkin*

309.     Dr. Strous prepared a psychiatric diagnostic report on Na'ama Henkin.

310.     Dr. Strous used information from Na'ama's family, his years of experience, and his study of the relevant medical literature to reach his conclusions.

311.     Dr. Strous concluded that Mrs. Henkin "witnessing her husband being shot several times at close range, with the knowledge that this would kill him, would clearly have caused Mrs. Henkin extreme and most terrifying emotional distress." Ex. 6 at Ex. C. at 4.

312.     He further concluded that she likely lived for at least two minutes in intense emotional traumatic distress from the time when her family's car was first shot at, to her ultimately being shot and killed because she witnessed her husband's murder and feared that her children would also be shot. *Id.*

313.     Additionally, it is likely that she was experiencing shock and distress the few seconds after she was shot, before she died. *Id.*

---

principles and methods, and those principles and methods have been reliably applied to the facts of this case. *See* Fed. R. Evid. 702 (a)–(d).

314.     The Court finds that Na'ama suffered severe emotional injury and physical injuries
that culminated in her own death.

*(2) The Four Henkin Children*

315.     Dr. Strous prepared psychiatric diagnostic reports on the four minor Henkin
children which Plaintiffs have filed under seal.

316.     Dr. Strous's diagnostic reports on the children are based on an interview with their
maternal grandfather (who together with his wife are the children's legal guardians), an
interview with their paternal grandmother (Mrs. Chana Henkin), a review of their mental
health records (all four children had mental health treatment in the last five years), and
additional materials in this case, including the complaint, indictments of the terrorists, and
the police report for the attack.

317.     Dr. Strous did not interview the children because he, in consultation with the
children's maternal grandparents (their legal guardians), determined that speaking with the
children about the trauma of the attack might cause the children further psychological
harm.

318.     Based on the information available to him, Dr. Strous has credibly determined that
he is able to render a diagnostic opinion to a reasonable degree of medical certainty without
interviewing the children.

319.     For each of the Henkin children, Dr. Strous concludes, to a reasonable degree of
medical certainty, that each child has suffered significant psychological effects from the
Attack. The psychological symptoms vary across each child, but those with symptoms
include flashbacks, post-traumatic symptoms, anxiety, depression, grief, irritability,
difficulty falling asleep, and difficulty socializing. Ex. 6 at Ex. B (filed under seal).

320.    The Court finds that each of the four Henkin children suffered severe emotional injury and physical injuries.

*(3) Rabbi Judah Herzl Henkin*

321.    Judah Henkin was Eitam Henkin's father, but he has since passed away. Judah Henkin Decl. ¶ 3.

322.    Following the death of Eitam, Judah and his wife would see Ilana Goldberg, who specializes in Post-Traumatic Stress Disorder (PTSD), and they would go to family group counseling sessions with Dr. Naomi Baum. *Id.* at ¶¶ 8-9.

323.    Ms. Goldberg diagnosed Judah with PTSD, and Judah describes that after Eitam's death, he suffered unbearable pain and sadness which made it harder for him to go on with his daily life. *Id.* at Ex. 1, ¶¶ 18-19.

324.    Judah was at home in Israel when he found out about the attack. Jacob Bechor-Shalom Henkin Decl. ¶ 6.

325.    This Court finds that Judah Henkin suffered severe emotional injury and physical injuries as a result of his son's death.

*(4) Anne Chana Henkin*

326.    Anne Chana Henkin is Eitam Henkin's mother. Anne Chana Henkin Decl. ¶ 3.

327.    Following the death of Eitam, Anne and her husband would see Ilana Goldberg, who specializes in Post-Traumatic Stress Disorder (PTSD), and they would go to group counseling sessions with Dr. Naomi Baum. *Id.* at ¶¶ 22-24.

328.    Anne is now in immense pain after the death of her youngest son, has developed severe sleeping difficulties, relives pictures of the attack in her mind, and worries about how to help Eitam's children recover. *Id.* at ¶ 15.

329.    Anne was at home in Israel when she found out about the attack. Jacob Bechor-
        Shalom Henkin Decl. ¶ 6.

330.    This Court finds that Anne Henkin suffered severe emotional injury and physical
        injuries as a result of her son's death.

*(5) Aderet Rivka Henkin*

331.    Aderet Rivka Henkin is Eitam Henkin's sister. Aderet Henkin Decl. ¶ 3.

332.    Aderet also participated in group counseling with Dr. Naomi Baum. *Id.* at ¶ 22.

333.    Following Eitam's death, Aderet has become anxious, experiences extreme stress,
        constantly fears for her safety and the safety of her children, and is in a continual state of
        grieving. *Id.* at ¶¶ 8-9, 20

334.    This Court finds that Aderet Henkin suffered severe emotional injury and physical
        injuries as a result of her brother's death.

*(6) Eliashir Elijah Henkin*

335.    Eliashir Elijah "Eliyahyu" Henkin, is Eitam Henkin's brother. Eliashir Elijah
        Henkin Decl. ¶ 3.

336.    Eliyahu also participated in group counseling with Dr. Naomi Baum. *Id.* at ¶ 17.

337.    Eliyahu was in Israel when he found out about the attack and had to identify Eitam's
        body after the shooting. *Id.* at ¶ 7.

338.    Following Eitam's death, Eliyahu has difficulty finding energy to do his job as a
        weightlifting coach or pursue his hobbies such as weightlifting, tai chi, martial arts, hiking,
        writing, directing videos, and cooking. *Id.* at ¶ 12. These struggles have caused him
        financial hardship and frustration. *Id.*

339.    This Court finds that Eliyahu Henkin suffered severe emotional injury and physical injuries as a result of his brother's death.

*(7) Jacob (Bechor Shalom) Henkin*

340.    Jacob (Bechor Shalom) Henkin is Eitam Henkin's brother. Jacob Bechor-Shalom Henkin Decl. ¶ 3.

341.    Jacob also participated in group counseling with Dr. Naomi Baum. *Id.* at ¶ 28.

342.    The death of Eitam has affected Jacob's job as a network administrator because he is only about to work at 40-50% of the hours at his job so he can spend more time taking care of his family, particularly his parents. *Id.* at ¶¶ 15-16.

343.    Jacob suffers from severe anxiety and fear, has withdrawn from relationships due to the combined grief and stress of his brother's death, and his health has been affected because he does not exercise as regularly as he used to. *Id.* at ¶¶ 19-27. Jacob also endures extreme mental anguish, physical weakness, and loss of the affection and companionship of his brother. *Id.* at ¶ 30.

344.    Jacob was in Israel at home with his parents when he found out about the attack on Eitam. *Id.* at ¶ 6.

345.    This Court finds that Jacob Henkin suffered severe emotional injury and physical injuries as a result of his brother's death.

*(8) Joseph Gil Henkin*

346.    Joseph Gil "Yagil" Henkin, is Eitam Henkin's brother. Joseph Gil Henkin Decl. ¶ 4.

347.    Yagil also participated in group counseling with Dr. Naomi Baum. *Id.* at ¶ 26.

348.    Yagil suffered grief, fear, mental anguish, emotional distress, and general physical and mental weakness stemming from Eitam's death.

349.    Yagil was at a concert when his mother tried to call him to alert him of his brother's death. *Id.* at 5.

350.    This Court finds that Yagil Henkin suffered severe emotional injury and physical injuries as a result of his brother's death.

*(9) Taama Freida (Henkin) Yaakovson*

351.    Taama Freida (Henkin) Yaakovson is Eitam Henkin's sister. Taama Freida (Henkin) Yaakovson Decl. ¶ 3.

352.    Taama also participated in group counseling with Dr. Naomi Baum. *Id.* ¶ 23.

353.    Following Eitam's death, Taama experiences great sadness causing her to not be available for her children, and she has lost interest in many activities that she once enjoyed. *Id.* at ¶ 18.

354.    Taama is no longer able to engage in certain functions at the high school she works at because they remind her of her brother's death. *Id.* at ¶ 21.

355.    Taama was at the school she teaches at when she found out about the attack. *Id.* at ¶ 4.

356.    This Court finds that Taama (Henkin) Yaakovson suffered severe emotional injury and physical injuries as a result of her brother's death.

**Conclusions of Law**

**Choice of Law**

1.  To the extent Plaintiffs in either Case 1273 or Case 1184 have asserted claims that do not arise out of § 1605A(c), Israeli law governs such non-§ 1605A(c) claims. *See* Mem. Op. 9–16.

**Subject-Matter Jurisdiction**

*(a) 1273 Case*

*(i) Judah Herzl Henkin*

2.  Judah asserted a claim against Defendants Iran and Syria under 28 U.S.C. § 1605A(c)(1) as a national of the United States at the time of the terror attack. Section 1605A(c)(1) creates a private right of action, stating that "a foreign state that is or was a state sponsor of terrorism... shall be liable to a national of the United States" for actions of wrongful death and personal injury arising out of extrajudicial killings or hostage takings. *See* Compl. 3, ECF No. 1; *see also supra* Finding of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under the Foreign Sovereign Immunities Act ("FSIA") Terrorism Exception clause. *See* 28 U.S.C. §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 28–29.

*(ii) Anne Chana Henkin*

3.  Anne asserted a claim against Defendants Iran and Syria under § 1605A(c)(1) as a national of the United States at the time of the terror attack. *See* Compl. 3, ECF No. 1; *see also supra* Finding of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 28–29.

*(iii)Aderet Rivka Henkin*

4.   Aderet asserted a claim against Defendants Iran and Syria under § 1605A(c)(1) as a
     national of the United States at the time of the terror attack. *See* Compl. 3, ECF No. 1; *See*
     *supra* Findings of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under
     the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also*
     Mem. Op. 28–29.

*(iv) Eliashir Elijah Henkin*

5.   Eliashir asserted a claim against Defendants Iran and Syria under § 1605A(c)(1). *See*
     Compl. 3, ECF No. 1; *See supra* Findings of Fact ¶ 11. The Court has subject-matter
     jurisdiction over this claim under the FSIA Terrorism Exception clause. *See*
     §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 28–29.

*(v) Jacob (Bechor Shalom) Henkin*

6.   Jacob asserted a claim against Defendants Iran and Syria under § 1605A(c)(1) as a national
     of the United States at the time of the terror attack. *See* Compl. 3, ECF No. 1; *See supra*
     Findings of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under the
     FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also*
     Mem. Op. 28–29.

*(vi) Joseph Gil Henkin*

7.   Joseph asserted a claim against Defendants Iran and Syria under § 1605A(c)(1) as a
     national of the United States at the time of the terror attack. *See* Compl. 3, ECF No. 1; *See*
     *supra* Findings of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under
     the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also*
     Mem. Op. 28–29.

*(vii)        Taama Freida (Henkin) Yaakovson*

8.  Taama asserted a claim against Defendants Iran and Syria under § 1605A(c)(1) as a national of the United States at the time of the terror attack. *See* Compl. 3, ECF No. 1; *See supra* Findings of Fact ¶ 11. The Court has subject-matter jurisdiction over this claim under the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 28–29.

*(b) 1184 Case*

*(i) Eitam Henkin*

9.  The Estate of Eitam asserted claims against Defendants Iran, the IRGC, the MOIS, Bank Markazi, Bank Melli, Bank Saderat, and Syria under § 1605A(c)(4) as the legal representative of a national of the United States at the time of the terror attack. *See* Compl. 30–38, ECF No. 1; *See supra* Findings of Fact ¶ 10. The Estate of Eitam also asserted claims under Israeli law. *See* Compl. 30–38, ECF No. 1; *See supra* Findings of Fact ¶ 13. The Court has subject-matter jurisdiction over these claims under the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 29–33.

*(ii) Na'ama Henkin*

10. The Estate of Na'ama asserted a claim against Defendants Iran, the IRGC, the MOIS, Bank Markazi, Bank Melli, Bank Saderat, and Syria under Israeli law. *See* Compl. 30–38, ECF No. 1; *See supra* Findings of Fact ¶ 12. The Court has subject-matter jurisdiction over this claim under the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 29–33.

*(iii)The Four Henkin Children*

11. The four minor Henkin children asserted claims against Defendants Iran, the IRGC, the MOIS, Bank Markazi, Bank Melli, Bank Saderat, and Syria under Israeli law. *See* Compl. 30–38, ECF No. 1; *See supra* Findings of Fact ¶ 12. The Court has subject-matter jurisdiction over these claims under the FSIA Terrorism Exception clause. *See* §§ 1605A(a)(2)(A)(i)(II), and (A)(ii)(I); *see also* Mem. Op. 29–33.

**Personal Jurisdiction**

12. The Court has personal jurisdiction over all Defendants from cases 1273 and 1184 under 28 U.S.C. § 1330(b), which states that "personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) where service has been made under section 1608 of this title." Thus, 1330(b) establishes these two requirements: (1) The Court must have subject-matter jurisdiction over the Plaintiff's claims, and (2) each Defendant must be properly served. The Court has already explained why it has subject-matter jurisdiction over all the claims brought by all the Plaintiffs in both civil actions. *See supra* Conclusions of Law ¶¶ 2–11; *see also* Mem. Op. 27–33. Additionally, for the reasons explained below, the Plaintiffs properly served each of the named Defendants. *See infra* ¶¶ 13–54.

*(a) 1273 Case*

    *(i)    Iran*

13. Iran is a 'foreign state' under § 1608(a); therefore, service of process can be properly made under § 1608(a). *See supra* Findings of Fact ¶ 150. The Court has personal jurisdiction over Iran under § 1330(b) because Plaintiffs properly served Iran.

14. Under § 1608(a)(1), service of process can be made "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between plaintiff and the foreign state or political subdivision." Here, Iran and the United States did not have a special arrangement.

15. If no special arrangement exists, § 1608(a)(2) states that service can be made by "delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." Iran has also not agreed to any applicable international convention on service of process.

16. Since service of process was not possible under § 1608(a)(1) or § 1608(a)(2), the Plaintiffs attempted service under § 1608(a)(3). Section 1608(a)(3) states that service can be made "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." On August 8, 2018, Plaintiffs filed an affidavit requesting foreign mailing services. Affidavit, ECF No. 6. On August 18, 2018, the Clerk then certified that she had mailed a copy of the summons and complaint, with a translation of each. Certification, ECF No. 10. However, service on Iran was not achieved by means pursuant to § 1608(a)(3). Affidavit, ECF No. 11.

17. Having exhausted their options, Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on September 18, 2018. Affidavit, ECF No. 11. Section 1608(a)(4) states that if "service cannot be made within 30 days under paragraph (3), ... the Secretary [of State] shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when

the papers were transmitted." Plaintiffs officially served Iran through the diplomatic assistance of Switzerland on December 19, 2018. Return of Service, ECF No. 14. The Clerk then filed the return of service on the ECF system on February 6, 2016. Return of Service, ECF No. 14. Finally, the Clerk entered default as to Iran on May 6, 2019. Entry of Default, ECF No. 17.

   *(ii)    Syria*

18. Syria is a 'foreign state' under § 1608(a); therefore, service of process can be properly made under § 1608(a). *See supra* Findings of Fact ¶ 284. The Court has personal jurisdiction over Syria under §§ 1330(b) because Plaintiffs properly served Syria.

19. Service of process under § 1608(a)(1) and (a)(2) were not viable options because Syria and the United States did not have a prior arrangement, nor did Syria partake in an applicable international convention.

20. The Plaintiffs then attempted service under § 1608(a)(3) on August 8, 2018, by filing an affidavit requesting foreign mailing services. Affidavit, ECF No. 7. On August 18, 2018, the Clerk certified that she had mailed a copy of the summons and complaint with a translation of each. Certification, ECF No. 10. Plaintiffs attested that service via 1608(a)(3) failed. Affidavit, ECF No. 11.

21. Having exhausted their options under § 1608(a)(1), (2), and (3), Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on September 18, 2018. Affidavit, ECF No. 11. Plaintiffs officially served Syria through the diplomatic assistance of the Czech Republic on January 22, 2019. Return of Service, ECF No. 15. The Clerk then filed the return of service on the ECF system on March 12, 2019. Return of Service, ECF No. 15.

Finally, the Clerk entered default as to Syria on May 6, 2019. Entry of Default, ECF No. 18.

(b) *1184 Case*

  (i)    *Iran*

22. The Court has personal jurisdiction over Iran under § 1330(b) because Plaintiffs properly served Iran.

23. Service of process under §§ 1608(a)(1) and (a)(2) were not viable options because Iran and the United States did not have any special arrangements, nor did Iran partake in an applicable international convention.

24. The Plaintiffs then attempted service under § 1608(a)(3) on May 20, 2019 by filing an affidavit requesting foreign mailing services. Affidavit, ECF No. 5. On May 29, 2019, the Clerk certified that she had mailed a copy of the summons and complaint with a translation of each. Certification, ECF No. 8. The attempted service was returned unexecuted, and proof was filed with the Court on July 31, 2019. Summons Returned, ECF No. 17.

25. Having exhausted their options under § 1608(a)(1), (2), and (3), Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on July 31, 2019. Affidavit, ECF No. 18. Plaintiffs officially served Iran through the diplomatic assistance of Switzerland on September 23, 2019. Affidavit, ECF No. 28. The Clerk then filed the return of service on the ECF system on October 31, 2019. Return of Service, ECF No. 31. Finally, the Clerk entered default as to Iran on April 6, 2020. Entry of Default, ECF No. 38.

  (ii)   *IRGC*

26. The Court has personal jurisdiction over the IRGC under § 1330(b) because Plaintiffs properly served the IRGC.

27. The IRGC is considered a political subdivision of Iran under § 1608(a) because its core functions are inherently governmental. *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019); *see also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151–53 (D.C. Cir. 1994); *see also Roder v. Islamic Republic of Iran*, 333 F.3d 228, 234–35 (D.C. Cir. 2003); *see also* Findings of Fact ¶ 182.

28. Service of process under §§ 1608(a)(1) and (a)(2) were not viable options because the IRGC and the United States did not have a special arrangement, nor did the IRGC partake in an applicable international convention.

29. The Plaintiffs then attempted service under § 1608(a)(3) on May 20, 2019 by filing an affidavit requesting foreign mailing services. Affidavit, ECF No. 5. On May 29, 2019, the Clerk certified that she mailed a copy of the summons and complaint with a translation of each. Certification, ECF No. 8. The attempted service was returned unexecuted, and proof was filed with the court on July 31, 2019. Summons Returned, ECF No. 17.

30. Having exhausted all options under § 1608(a)(1), (a)(2), and (a)(3), Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on July 31, 2019. Affidavit, ECF No. 18. Plaintiffs officially served the IRGC through the diplomatic assistance of Switzerland on September 23, 2019. Affidavit, ECF No. 28. The Clerk then filed the return of service on the ECF system on October 31, 2019. Return of Service, ECF No. 31. Finally, the Clerk entered default as to the IRGC on April 6, 2020. Entry of Default, ECF No. 38.

    *(iii)    MOIS*

31. The Court has personal jurisdiction over the MOIS under § 1330(b) because Plaintiffs properly served the MOIS.

32. The MOIS is a considered a political subdivision of Iran under § 1608(a) because its core functions are inherently governmental. *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019); *see also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151–53 (D.C. Cir. 1994); *see also Roder v. Islamic Republic of Iran*, 333 F.3d 228, 234–35 (D.C. Cir. 2003); *see also* Findings of Fact ¶ 193.

33. Service of process under §§ 1608(a)(1) and (a)(2) were not viable options because the MOIS and the United States did not have a special arrangement, nor did the MOIS partake in an applicable international convention.

34. The Plaintiffs then attempted service under § 1608(a)(3) on May 20, 2019 by filing an affidavit requesting foreign mailing services. Affidavit, ECF No. 5. On May 29, 2019, the Clerk certified that she mailed a copy of the summons and complaint with a translation of each. Certification, ECF No. 8. The attempted service was returned unexecuted, and proof was filed with the court on July 31, 2019. Summons Returned, ECF No. 17.

35. After exhausting all options under § 1608(a)(1), (a)(2), and (a)(3), Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on July 31, 2019. Affidavit, ECF No. 18. Plaintiffs officially served the MOIS through the diplomatic assistance of Switzerland on September 23, 2019. Affidavit, ECF No. 28. The Clerk then filed the return of service on the ECF system on October 31, 2019. Return of Service, ECF No. 31. Finally, the Clerk entered default as to the MOIS on April 6, 2020. Entry of Default, ECF No. 38.

   *(iv)    Bank Markazi*

36. The Court has personal jurisdiction over Bank Markazi under § 1330(b) because Plaintiffs properly served Bank Markazi under § 1608(b)(3)(B). Section 1608(b) guides service of process for agencies or instrumentalities of a foreign state.

37. Bank Markazi is an agency or instrumentality of Iran because its core functions are primarily commercial. *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011); *see also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151–53 (D.C. Cir. 1994); *see also* Findings of Fact ¶ 208.

38. Since Bank Markazi is an agency or instrumentality of Iran, § 1608(b)(1) states that service of process could be made "in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." Here, the United States did not have a special arrangement with Bank Markazi.

39. If no special arrangement exists, § 1608(b)(2) states that service can be made "in accordance with an applicable international convention[.]" Here, Bank Markazi did not participate in any applicable international conventions to guide service of process.

40. Since neither option was viable, Plaintiffs requested service via U.S. mail on Bank Markazi pursuant to § 1608(b)(3)(B) on May 20, 2019. Affidavit, ECF No. 5. Section 1608(b)(3)(B) states that if service cannot be made under (b)(1) or (b)(2), service may be made "by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—by any form of mail requiring a signed receipt…" as long as it was reasonably calculated to give actual notice. Plaintiffs properly served Bank Markazi on June 19, 2019, via USPS Registered Mail, which required a signed receipt. Return of Service, ECF No. 14. Proof of service was filed on July 31, 2019. Return of Service, ECF No. 14. Finally, the Clerk entered default as to Bank Markazi on April 6, 2020. ECF No. 36.

*(v)*     *Bank Melli*

41. The Court has personal jurisdiction over Bank Melli under § 1330(b) because Plaintiffs properly served Bank Melli under § 1608(b)(3)(B).

42. Bank Melli is an agency or instrumentality of Iran because its core functions are primarily commercial. *See Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954–57 (9th Cir. 2016); *see also Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 418–19 (S.D.N.Y. 2013); *see also* Findings of Fact ¶ 243.

43. Since Bank Melli is an agency or instrumentality of Iran, § 1608(b)(1) states that service of process can be made "in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." Here, the United States did not have a special arrangement with Bank Melli.

44. If no special arrangement exists, § 1608(b)(2) states that service can be made "in accordance with an applicable international convention[.]" Here, Bank Melli did not participate in any applicable international conventions to guide service of process.

45. Since neither option was viable, Plaintiffs requested service via U.S. mail on Bank Melli pursuant to § 1608(b)(3)(B) on May 20, 2019. Affidavit, ECF No. 5. Plaintiffs properly served Bank Melli on June 20, 2019, via USPS Registered Mail, which required a signed receipt. Return of Service, ECF No. 15. Proof of service was filed on July 31, 2019. Return of Service, ECF No. 15. Finally, the Clerk entered default as to Bank Melli on April 6, 2020. ECF No. 37.

*(vi)*     *Bank Saderat*

46. The Court has personal jurisdiction over Bank Saderat under § 1330(b) because Plaintiffs properly served Bank Saderat under § 1608(b)(3)(B).

47. Bank Saderat is an agency or instrumentality of Iran because its core functions are primarily commercial. *See Shoham v. Islamic Republic of Iran*, 2017 WL 2399454, at *8 (D.D.C. June 1, 2017) (holding that Bank Saderat is an instrumentality of Iran), *appeal dismissed*, 2019 WL 1270405 (D.C. Cir. Feb. 25, 2019); *see also* Findings of Fact ¶ 274.

48. Since Bank Saderat is an agency or instrumentality of Iran, § 1608(b)(1) states that service of process can be made "in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." Here, the United States did not have a special arrangement with Bank Saderat.

49. Subsequently, if no special arrangement exists, § 1608(b)(2) states that service can be made "in accordance with an applicable international convention[.]" Here, Bank Saderat did not participate in any applicable international conventions to guide service of process.

50. Since neither option was viable, Plaintiffs requested service via U.S. mail on Bank Saderat pursuant to § 1608(b)(3)(B) on May 20, 2019. Affidavit, ECF No. 5. Plaintiffs properly served Bank Saderat on June 19, 2019, via USPS Registered Mail, which required a signed receipt. Return of Service, ECF No. 16. Proof of service was filed on July 31, 2019. Return of Service, ECF No. 16. Finally, the Clerk entered default as to Bank Saderat on October 26, 2020. ECF No. 44.

   *(vii)    Syria*

51. The Court has personal jurisdiction over Syria under § 1330(b) because Plaintiffs properly served Syria.

52. Service of process under §§ 1608(a)(1) and (a)(2) were not viable options because Syria and the United States did not have a special arrangement, nor did Syria partake in an applicable international convention.

53. The Plaintiffs then attempted service under § 1608(a)(3) on June 11, 2019 by filing an affidavit requesting foreign mailing services. Affidavit, ECF No. 9. On July 31, 2019, the Clerk certified that she had mailed a copy of the summons and complaint with a translation of each via DHL. Certification, ECF No. 20. The attempted service was returned unexecuted on August 6, 2019, and proof was filed with the court September 9, 2019. Summons Returned, ECF No. 24.

54. After exhausting all options under § 1608(a)(1), (2), and (3), Plaintiffs requested diplomatic assistance pursuant to § 1608(a)(4) on September 9, 2019. Affidavit, ECF No. 25. Plaintiffs officially served Syria through the diplomatic assistance of the Czech Republic on January 12, 2020. Return of Service, ECF No. 32. The Clerk then filed the return of service on the ECF on January 13, 2020. Return of Service, ECF No. 32. Finally, the Clerk entered default as to Syria on April 6, 2020. Entry of Default, ECF No. 39.

**Venue**

55. The United States District Court for the District of Columbia is the proper venue for the foreign states and the political subdivisions under 28 U.S.C. § 1391(f)(4). Section 1391(f)(4) states that "a civil action against a foreign state as defined in section 1603(a) of this title may be brought in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." Iran and Syria are both foreign states. *See supra* Conclusions of Law ¶¶ 13, 18. The IRGC and the MOIS are both political subdivisions of foreign states. *See supra* Conclusions of Law ¶¶ 27, 32.

56. Venue is governed by § 1391(f)(3) for agencies and instrumentalities. Section § 1391(f)(3) states that venue may be brought "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." Bank Markazi, Bank Melli,

and Bank Saderat are all agencies or instrumentalities of Iran. *See supra* Conclusions of Law ¶¶ 37, 42, 47. Plaintiffs did not show that Bank Markazi is licensed to do or is doing business in the District of Columbia. Plaintiffs also did not show that Bank Melli is licensed to do or is doing business in the District of Columbia. Plaintiffs also did not show that Bank Saderat is licensed to do or is doing business in the District of Columbia. However, Defendants forfeited any objection to improper venue by defaulting. *See Hoffman v. Blaski*, 363 U.S. 335, 340–44 (1960); *see also* Mem. Op. 33–37. Thus, the District of Columbia is a proper venue for all of the claims brought forth in both civil actions.

**Liability**

*(a) 1273 Case*

57. Defendants Iran and Syria are jointly and severally liable to each of the Plaintiffs in Case 1273 under § 1605A(c).

58. First, Plaintiffs are all U.S. nationals and were at the time of the attack. *See supra* Findings of Fact ¶¶ 6–7. Second, all of the 1273 Plaintiffs suffered personal injury as a result of Eitam Henkin's death. *See supra* Findings of Fact ¶¶ 325, 331, 336, 342, 349, 355, 362. And third, all of the named Defendants provided "material support or resources" to Hamas, which resulted in the extrajudicial killing of Eitam Henkin. *See supra* Findings of Fact ¶¶ 168, 303.

59. The killing of Eitam Henkin was an extrajudicial killing because it was a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102–256, § 3(a), 106 Stat. 73.

60. Thus, the Defendants are liable to Judah Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

61. Defendants are also liable to Anne Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

62. Defendants are also liable to Aderet Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

63. Defendants are also liable to Eliashir Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

64. Defendants are also liable to Jacob Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

65. Defendants are also liable to Joseph Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

66. Defendants are also liable to Taama (Henkin) Yaakovson under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

67. By contrast, Defendants are not liable to the 1273 Plaintiffs under non-§ 1605A(c) claims because the 1273 Plaintiffs did not assert Israeli law claims.

*(b) 1184 Case*

68. Defendants Iran, the IRGC, the MOIS, Bank Markazi, Bank Saderat, Bank Melli, and Syria are jointly and severally liable to Eitam Henkin under § 1605A(c) for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

69. Eitam was a U.S. national, who was extrajudicially killed, which was a result of Defendants' material support for Hamas. *See supra* Findings of Fact ¶¶ 4, 168, 181, 192, 228, 258, 282, 303.

70. Defendants are also liable to Eitam under Israeli-law theories of primary, secondary, and vicarious liability for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

71. Defendants are primarily liable for committing their own tort of "Negligent Support of Terrorism." *See* Mem. Op. 17–18.

72. Defendants are secondarily liable to Eitam for aiding and abetting Hamas's torts. Hamas committed assault and negligent infliction of physical and emotional injuries against Eitam. *See* Mem. Op. 18–19.

73. Finally, Defendants are vicariously liable to Eitam for the torts committed by their agents (i.e., the Hamas terrorists). Hamas committed assault and negligent infliction of physical and emotional injuries against Eitam. *See* Mem. Op. 19–20.

74. The Estate of Na'ama and the children cannot recover under § 1605A(c) because they are not currently U.S. nationals and were not at the time of the attack. *See supra* Findings of Fact ¶ 5.

75. Defendants—Iran, the IRGC, the MOIS, Bank Markazi, Bank Saderat, Bank Melli, and Syria—are jointly and severally liable to Na'ama and the children under the Israeli-law theories of primary, secondary, and vicarious liability for compensatory and/or punitive damages in an amount to be determined by a Special Master to be appointed hereafter.

76. Similar to Eitam, Defendants are primarily liable to the Estate of Na'ama and the children for "Negligent Support of Terrorism." *See* Mem. Op. 17–18.

77. Defendants are secondarily liable to the Estate of Na'ama and the children for aiding and abetting Hamas's torts. The torts against Na'ama and the children are assault and negligent infliction of physical and emotional injuries. *See* Mem. Op. 18–19.

78. Defendants are also vicariously liable to the Estate of Na'ama and the children for the torts committed by their agents (i.e., the Hamas terrorists). Once again, these torts for Na'ama and the children are assault and negligent infliction of physical and emotional injuries. *See* Mem. Op. 19–20.


SIGNED this 2ᵗʰ day of July, 2021.

Royce C. Lamberth

Royce C. Lamberth

United States District Judge